MENDELL M. SELIG *vs.* SAMUEL H. WEXLER & others.

Suffolk.   February 7, 1969. — April 15, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Trust,* Termination, Voting trust.   *Corporation,* Officers and agents, Voting trust.

Evidence in a suit in equity supported a conclusion that certain directors of a corporation supposedly neutral as between two persons who were stockholders, directors and officers had become in fact unneutral in favor of one of such persons; but the evidence did not support a conclusion that conduct of that person in merely inquiring of officials of the corporation whether they would be willing to serve as directors was "destructive of" their neutrality even though he had the power to set their salaries and to discharge them.  [678–679]

A decree in a suit in equity terminating a voting trust was proper where it appeared that the major purposes of the trust were continuity and stability of policy and management of a corporation, and that equality in control of the corporation as between the interests of two families was intended and there were provisions for a neutral trustee and neutral directors to resolve issues when such family interests became deadlocked, but that the purposes of the trust had become frustrated by reason of unneutrality in fact of the supposedly neutral trustee and neutral directors in office.  [679–681]

BILL IN EQUITY filed in the Superior Court on March 15, 1966.

The suit was heard by *Sgarzi,* J.

*Robert W. Meserve* (*Thomas B. Merritt* with him) for Samuel H. Wexler & another.

*James D. St. Clair* for the plaintiff.

*Jerome Medalie,* for Bernard A. Riemer, submitted a brief.

SPALDING, J.   The plaintiff Mendell M. Selig (Selig) by this bill in equity seeks to terminate a voting trust agreement dated June 24, 1963.   The plaintiff and the defendants, Samuel H. Wexler (Wexler), his son Robert H. Wexler, and Mr. Bernard A. Riemer (Riemer), are all voting trustees.   The Wexlers filed a counterclaim, which named Jerome M. Asher (Asher), the remaining trustee, as an additional de-

fendant, seeking declaratory relief under G. L. c. 231A, by an interpretation and construction of the voting trust agreement. The plaintiff twice amended his bill after two demurrers filed by Mr. Riemer were sustained. A third demurrer by Mr. Riemer and a demurrer by the Wexlers were overruled. The defendants appealed from an interlocutory decree overruling these demurrers and from the final decree, which terminated the trust and dismissed the counterclaim.

There is a report of the material facts and the evidence is reported. We can thus find facts not expressly found by the judge; and if convinced that he was plainly wrong, we can find facts contrary to his findings. *Lowell Bar Assn.* v. *Loeb,* 315 Mass. 176, 178. "'Inferences from the basic facts shown by . . . [oral] testimony, however, are open for our decision, and the inferences drawn by the trial judge are entitled to no weight in this court.' *Malone* v. *Walsh,* 315 Mass. 484, 490, and cases cited." *Seder* v. *Gibbs,* 333 Mass. 445, 447. Guided by these principles, we summarize the facts as follows:

Selig started a furniture business in 1931 in the city of Gardner. Shortly thereafter Wexler joined him as a partner. In 1933, the business, which is now known as the Selig Manufacturing Company, Inc. (Company), was incorporated. Selig and Wexler each received 50% of the capital stock. The Company has never declared any dividends, and thus the income derived by Selig and Wexler has been in the form of compensation for services rendered.

Selig, who became the Company's treasurer, originally had general charge of manufacturing and finances. Wexler became the president, with general charge of design and sales. Selig, Wexler, and the defendant Mr. Riemer, an attorney, were the directors of the Company. Between 1950 and 1955 heated and acrimonious disputes occurred between Selig and Wexler concerning the operations of the Company. In the summer of 1955 Selig, Wexler, and Mr. Riemer entered into a voting trust agreement with a term of ten years. Mr. Riemer was intended to be a neutral or independent trustee.

Selig suffered severe injuries to his neck in the fall of 1956,

which incapacitated him until late 1958. During this period Wexler and his son Robert took over Selig's duties. Thereafter Selig wished to resume his former duties, but his request was voted down by Wexler and Riemer. By this time the Company had manufacturing plants located in Leominster, Massachusetts, Monroe, Louisiana, and Siler City, North Carolina, and had acquired an interest in a plant in Ontario, Canada. Selig was put in charge of the Canadian operation and of a new line of activity called the contract business, which involved sales directly to colleges and other institutions. The contract business, which Selig built into a significant part of the Company's operations, has shown steady growth. At the time of the trial certain other portions of the business, which previously had shown considerable growth and profits, were in decline.

In 1962 Wexler wanted to terminate the contract business, and he so advised Selig. Termination of this activity would have left Selig without substantial employment. At a meeting of the voting trustees, Wexler proposed that he be given authority to terminate the contract business. Although Riemer felt this was an unwise decision, he voted for the proposal with Wexler. Riemer later attempted to persuade Wexler not to terminate the contract business, but he never sought to rescind the vote. In fact the contract business was never terminated.

Late in 1962, about two years before the voting trust agreement was to expire, Wexler and Riemer urged upon Selig its extension or renewal. Selig opposed this suggestion, stating that he had lost confidence in Riemer as an impartial trustee and director. In addition to voting with Wexler to prevent Selig from returning to his previous duties and to authorize the termination of the contract business, Riemer had also voted to pay Wexler a bonus of $20,000 for the year 1958. Up to this time Selig and Wexler had received equal compensation. In 1959 an identical bonus was voted to Wexler, and in 1960 his salary was increased by $20,000, with the result that his annual compensation exceeded Selig's by that amount.

In December, 1962, Selig and Wexler met in New York to discuss the renewal of the voting trust agreement. Wexler stated that he would remove Riemer as a voting trustee if Selig would renew the agreement. At the meeting Selig and Wexler, neither of whom previously had a written contract with the Company, discussed the possibility of obtaining long term contracts. Selig stated that if he had such a contract, he would not object to contracts for Wexler and his son Robert. The meeting ended without any agreements being reached.

Thereafter further discussions and negotiations were held, primarily by Robert Wexler on behalf of Wexler and Asher on behalf of Selig, his father-in-law. At a stockholders meeting on February 12, 1963, the trustees voted to recommend to the directors that the voting trust agreement be extended for ten years without any substantial changes and that employment contracts be entered into with Selig and Wexler, with the latter to be president at a salary of $70,000 a year and the former as chairman of the board at a salary of $55,000. The ratio of seven to five and one half was to be maintained if salary adjustments were made. It was further recommended that Selig and Wexler explore the possibility of replacing Riemer as a trustee. These recommendations were adopted at the subsequent meeting of the board of directors. There were eight directors at that time, consisting of Selig, his son Edward Selig, Asher, Wexler, his sons Robert and Jerrold Wexler, Riemer, and Henry Silverman (Silverman), who for many years was the Company's accountant. Three directors were chosen by Selig, and three by Wexler, and Riemer and Silverman were expected to be neutral.

Further negotiations were held, again primarily by Asher and Robert Wexler, in order to draw up the new voting trust agreement and the employment contracts. The voting trust, which is dated June 24, 1963, covered not only the Company but also six other corporations owning real estate and other property used by the Company. The parties to the agreement, which was to remain in effect until the death

of the survivor of Selig, Wexler, and four other named individuals, ratified the past actions of the voting trustees, stockholders, and directors of the seven corporations.

The agreement stated its purposes were "to secure continuity and stability of policy and management of . . . [the Company]" and "to establish a relationship of harmony, mutual cooperation and respect, so as to enhance their happiness and promote the business of . . . seven (7) corporations." The number of voting trustees was expanded to five, consisting of Selig, Wexler, and Riemer, plus Asher and Robert Wexler. The agreement provided that there would continue to be eight directors, three chosen by Selig, three by Wexler, plus Riemer and Silverman "whose respective terms of office both expire with the annual meeting in 1966 and until their respective successors are chosen and qualified." The neutral directors were to be chosen by a vote of four of the five trustees. In the event of an impasse, the Company's by-laws were to be amended to provide for a ninth director. The directors then in office would attempt to choose the seventh, eighth, and ninth directors from six nominees, three nominated by Selig and three by Wexler. Each such nominee had to be either a Company officer earning at least $15,000 a year or a former director. Every director was required to cast a vote for four different nominees. If this procedure also produced a deadlock, then a selection was to be made from the nominees by lot. The voting trustees, as required by the agreement, would then elect the candidates so chosen.

The employment contracts as drawn up provided salaries of $70,000 and $55,000 for Wexler and Selig, respectively. The salary differential was to remain at $15,000 if any adjustments, except certain required decreases for physical disabilities, were made. Selig, relying on this provision of a constant differential and on the voting trust agreement's provision for three neutral directors, approved the execution of the employment contracts and the voting trust. Although dated differently, the employment contracts and the new voting trust agreement were actually part of one trans-

action. Neither the contracts nor the agreement would have been adopted without the other.

At a board of directors meeting on January 30, 1965, Silverman, at Wexler's request, moved that Wexler be paid a bonus of $20,000. The motion was put to a voice vote, and the Wexlers, Silverman, and Riemer voted for the motion. Selig and Asher did not vote. When Asher complained to Riemer after the meeting that the bonus violated the employment contracts by giving Wexler additional compensation, Riemer stated that the bonus, although not prohibited by the contracts, should not have been granted. Although he advised Wexler not to take the bonus, Riemer took no action to have the directors rescind the vote or grant Selig an equal bonus.[1]

Wexler became aware in May, 1965, that Selig would attempt to take control at the next annual meeting in February, 1966. Wexler then conferred with each of the Company's officers who earned more than $15,000 a year, and with Riemer and Silverman to see if any of them would be willing to serve as directors. Each of the officers, as well as Riemer and Silverman could have been discharged by Wexler at will, and all had their compensation set by him.

Edward Selig and Asher resigned as directors shortly before the February, 1966, stockholders' meeting. Their purpose was to become eligible as "former directors" to be elected as the seventh, eighth, or ninth director. Selig called a special meeting of the voting trustees to act upon the resignations and to nominate their replacements.[2] At the meeting Wexler, even though he realized the voting trustees were obliged to fill the vacancies, successfully moved, against the objections of Selig and Asher, that the meeting be adjourned to April 18, 1966, or to a mutually acceptable date. The subsequent meetings of the stockholders and directors were similarly adjourned. Immediately thereafter, Wexler, Robert Wexler, Mr. Riemer, and

---

[1] The bonus was not paid until Wexler requested it late in 1965.

[2] These directors were to be replaced by Ann Selig Asher and Norman B. Asher.

a Mr. Saul Hahn, an attorney in Mr. Riemer's law firm, met
to discuss the resignations. At Robert Wexler's suggestion,
Mr. Hahn later drew up amendments to the voting trust to
provide that a director who has resigned would be ineligible
to be chosen again as a director until the date his term of
office would have expired. Wexler, Robert Wexler, and
Riemer intended to vote for these amendments at a special
meeting of the voting trustees to be held on March 25, 1966.[3]
No action on these amendments or on the resignations has
ever been taken because this bill was brought on March 15,
1966.

The judge made the following special findings and rulings:
The payment of the $20,000 bonus to Wexler in 1965 vi-
olated the employment contracts. The real purpose of the
voting trust agreement was to provide for the inclusion on
the board of directors of two or three people who would be
neutral, impartial, and not subject to the influence or con-
trol of either Selig or Wexler. Unless the people in the group
who can be nominated are in fact independent, the useful-
ness of the trust is destroyed. Both the scheme of resigning
to become "former directors" and the scheme of amending
the agreement to prevent such directors from serving before
their terms had expired are not in keeping with the purposes
of the voting trust. Wexler's approaching the officials who
earned more than $15,000 was "destructive of" their im-
partiality and independence.[4] Riemer as a voting trustee
and as a director has never voted against a proposal ad-
vanced by Wexler or for a proposal of Selig that Wexler
opposed. Wexler has destroyed the independence of both
Riemer and Silverman. And, finally, because Wexler de-
stroyed the independence of the neutral trustee and the
neutral directors, the voting trust has become a device
which insures permanent control of the Company in
Wexler.

[3] The voting trust agreement provided that it could be amended in most
instances by a majority vote of the trustees.

[4] Earlier in his findings the judge had stated that "the implication was in-
escapable that any action on . . . [the] part . . . [of these officials] con-
trary to Wexler's wishes would involve a risk to their employment."

The judge concluded his findings with an order that "[i]f within 60 days of this date the Voting Trust Agreement can be amended to provide for the selection of a voting trustee and one or more neutral directors . . . who are subject to no conflict of interest and who are beyond the . . . control of either Selig or Wexler, a decree is to enter dismissing the bill. Otherwise a decree is to enter declaring the Voting Trust Agreement to be invalid." More than three months later, no such amendment presumably having been made, a final decree was entered terminating the voting trust agreement and dismissing the Wexlers' counterclaim.

1. The first major issue presented is whether the evidence supports the findings that Riemer, Silverman and the officers of the Company approached by Wexler were not independent. We agree with the conclusion that Mr. Riemer was no longer independent. Of course, the mere fact that he voted for one side or another does not show that he was partial; despite his frequently successful attempts to reconcile differences between Selig and Wexler, Riemer occasionally had to choose one of two conflicting views. But his vote to authorize the termination of the contract business, even though he believed that it would be an unwise step, and his vote in 1965 in favor of Wexler's bonus, which, as the judge correctly ruled, violated the employment contracts, indicate that Riemer no longer was a neutral trustee or director. Although Selig signed the new voting trust agreement despite his prior objections to Riemer, this does not mean that Selig cannot complain of subsequent actions by Riemer which were not impartial in nature.

There is less evidence on the issue of Silverman's independence. He did vote in 1965 for Wexler's bonus. We recognize that he was not an attorney and, unlike Riemer, could not be expected to have a full appreciation of its legal consequences. Nevertheless, he had voted in February, 1963, on the provisions which formed the basis of the employment contracts and indicated, even to a layman, that no preferential compensation properly could be granted to either Wexler or Selig. Like Riemer, Silverman has never

voted against Wexler. We are of opinion that the judge did not err in concluding that Silverman's independence had been destroyed.

On the other hand, the evidence does not justify the conclusion that Wexler's actions in speaking to the Company officials about becoming directors was "destructive of" their independence. He merely asked them whether they were willing to serve. While it is true that Wexler had the power to fire them and to set their salaries, Selig knew this when he agreed to the new voting trust. There was no evidence that Wexler at any time had attempted to influence their decisions by threats of dismissals or pay cuts.

2. We now turn to the question whether the findings in relation to Riemer and Silverman are sufficient to support the final decree terminating the voting trust in substance on the ground that trust purposes had been frustrated.[5] There is no question that voting trusts are valid in this Commonwealth. See *Brightman* v. *Bates*, 175 Mass. 105, 111. *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 440. The rules of trust law in general apply to voting trusts, unless the terms of the trust agreement provide otherwise. Bogert, Trusts and Trustees (2d ed.) § 251, p. 113. Undoubtedly a trust may be terminated if the purposes for which it was created become impossible of accomplishment. Restatement 2d: Trusts, § 335. Bogert, Trusts and Trustees (2d ed.) § 1002. Scott, Trusts (3d ed.) § 335. See *Gordon* v. *Gordon*, 332 Mass. 193, 196–197. We are of opinion that under this principle a voting trust may likewise be terminated when its purposes have become frustrated or impossible. Impossibility and frustration are somewhat akin but are not precisely the same. See *Autry* v. *Republic Prod. Inc.* 30 Cal. (2d) 144, 148. Here it cannot be said that it was impossible

---

[5] In the Wexlers' original brief they argue that the lack of independence of a neutral trustee, although a possible ground for his removal, is not a sufficient reason for the termination of the trust. See *Barbour* v. *Weld*, 201 Mass. 513, 521. But the ground for the termination of the trust is not Riemer's lack of independence but rather the frustration of the trust's purposes. No question of termination of the voting trust involved in *Massa* v. *Stone*, 346 Mass. 67, was there considered.

to carry out the terms of the trust. But the objectives for which it was created have been defeated. The law of contracts furnishes an analogy. In discussing the doctrine of frustration in the law of contracts the Supreme Court of Connecticut recently said, "The doctrine of frustration of ·purpose, which has more modern origins . . . [than the ·doctrine of impossibility] excuses a promisor in certain situations where the objectives of the contract have been utterly defeated by circumstances arising after the formation of the agreement. . . . Excuse is allowed under this rule even though there is no impediment to actual performance." *Hess* v. *Dumouchell Paper Co.* 154 Conn. 343, 350–351.

Continuity and stability of policy and management were the major purposes of the voting trust; but this did not mean that either Selig or Wexler was intended to acquire permanent control. Instead, both the Selig and Wexler family interests were to have an equal amount of control. The neutral voting trustee and the neutral directors would resolve issues when the family interests became deadlocked. The decision that the trust's purposes had been frustrated was based on the conclusion that the neutral trustee, the neutral directors, and all the people who might be elected in 1966 to fill the positions of the neutral directors, were not in fact independent or impartial. While we are of opinion that the evidence does not support the conclusion that the independence of the Company's officers earning more than $15,000 was destroyed, we nevertheless agree that the trust's purposes had been frustrated. As stated above, the neutral directors were to be chosen by a vote of four of the five trustees, not by a mere majority vote. From a review of the evidence and the findings, we are convinced that it was highly improbable that four of the trustees would agree on the neutral directors. Thus, the alternative provisions allowing the existing directors to vote among six nominees named by Selig and Wexler were crucial. As we interpret these provisions, the existing neutral directors, not merely the directors representing Wexler and Selig, would be entitled to

vote during this procedure.[6]  But Riemer and Silverman were in fact not neutral directors; therefore the procedure could not have been carried out as intended, and the purposes of the trust were frustrated.[7]

3. In view of what we have said on the merits, we do not discuss the demurrers, other than to say that they were properly overruled.

*Interlocutory decree affirmed.*
*Final decree affirmed with costs*
*of appeal.*

---

[6] The trust states that "each Member of the Board of Directors" must vote.  Since directors were to continue in office until their successors were appointed, the neutral directors would still be members of the board at the time of this vote.

[7] The judge ruled that Riemer and Silverman could *not* participate in the selection of their successors, and the plaintiff in his brief concurs with this ruling.  But it is not clear whether this conclusion was based on the language of the trust agreement or on the idea that, despite the language, they could not vote since they had been shown not to be neutral.