APOSTOLOS C. KANNAVOS & another vs. CARRIE L. ANNINO
& others, trustees[1]
(and a companion case).

Hampden.   April 10, 1969. — May 9, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Fraud.  Deceit.  Sale,* Duty of disclosure, Sale of real estate, Rescission.
*Equity Jurisdiction,* Rescission.

The vendees in sales of real estate were entitled to rescind the sales where
it appeared that the vendors had converted the properties involved
from single family houses to multi-family apartment buildings in viola-
tion of the building and zoning ordinances of the city and had adver-
tised the properties as income producing apartment properties and fur-
nished income and expense figures in connection therewith, that the
vendors had expressly asserted that the properties were "furnished
apartments . . . being rented to the public for multi-family purposes"
and "could continue" to be operated for such purposes, that the vend-
ees relied on the vendors' representations and on "the appearances of
the real estate . . . [as] being used for multi-family purposes," that
the vendors knew that the vendees planned to continue to use the prop-
erties as apartments but failed to disclose to them the building and
zoning violations, that the vendees would not have purchased the prop-
erties if they had known thereof, and that the value of the properties
as single family dwellings was substantially less than their value as
apartments.

TWO BILLS IN EQUITY filed in the Superior Court on
November 1, 1965.

The suits were heard by *Meagher, J.,* on a master's report.

*Alfred W. Bettigole* for the defendants.

*Socrates Geanacopoulos* for the plaintiffs.

CUTTER, J.   These bills in equity are brought by the
vendees of real estate, fixtures, and personal property in

[1] In one case Kannavos and John G. Bellas are the plaintiffs.  In the other,
Kannavos and his wife are the plaintiffs.  The defendants are Carrie L. Annino,
Joseph Santospirito and Samuel V. Annino, III, individually and as trustees
of Annino Realty Trust.

Ingersoll Grove, Springfield, against the vendors, to rescind the purchases made in 1965. The amended bills alleged that the vendees bought in reliance on the vendors' fraudulent misrepresentations and concealment of material facts. Demurrers to the amended bills were overruled. The facts are stated on the basis of a confirmed master's report. By final decree rescission of the purchases was ordered. The vendors appealed.

Kannavos and his wife acquired 11 Ingersoll Grove from the vendors (who are the trustees of Annino Realty Trust) on June 28, 1965. Kannavos and Bellas bought 71–73 and 79 Ingersoll Grove from the vendors on July 12, 1965. The situation as to each purchase is substantially the same.[2]

Mrs. Annino (who at all pertinent times "was authorized to act and did act on behalf of . . . Annino Realty Trust") had bought the Ingersoll Grove properties in 1961 and 1962. At that time there was a single family house on each property. Each house was, under the Springfield zoning ordinance, in a Residence A district, where multi-family uses are prohibited. This zoning has remained in effect at all times since 1961. Despite the zoning provisions, Mrs. Annino converted each single family house into a multi-family apartment building.[3] Each was furnished and rented as a multi-family dwelling. All the work of conversion was done "without obtaining any building permit," as each trustee of the realty trust knew. Each trustee also knew that the use of the buildings for multi-family purposes was in violation of the zoning ordinance.

In 1965 Kenneth F. Foote was retained as real estate broker "to try to sell the properties." He caused advertisements, of which the following is an example, to appear in Springfield newspapers: "Income gross $9,600 yr. in lg. single house, converted to 8 lovely, completely furn. (includ. TV and china) apts. 8 baths, ideal for couple to live free

---

[2] The purchasers, for convenience, are referred to, for the most part, merely as the vendees, without regard to the circumstance that Kannavos had a different associate in each transaction.

[3] The 11 Ingersoll Grove house was made into eight apartments. The other two properties were converted into twenty apartments.

with excellent income. By apt. only. Foote Realty."
Each advertisement clearly advertised, in some form of
words, the particular property as being income property
of multi-family use.

Kannavos, a self-employed hairdresser, about thirty-
eight years old,[4] read one advertisement. He "wanted to
acquire some income real estate." He got in touch with
Foote, who showed him the 11 Ingersoll Grove property
and gave him income and expense figures obtained from
Mrs. Annino. Kannavos executed a purchase agreement to
buy 11 Ingersoll Grove. The vendees had no lawyer repre-
senting them with respect to the negotiations, the agree-
ment, or the final closing. An attorney representing a
mortgagee, under a mortgage obtained by the vendees, drew
and recorded the papers used at the closing, at which the
vendors were also represented by an attorney "to check the
adjustments."

"No statements were made by the . . . [vendors], by
. . . Foote . . . [or by either attorney] at any time during
the negotiations or closing, to the . . . [vendees] with
respect to zoning or building permits. The . . . [vendees]
made no inquiry of the" vendors, Foote, or the vendors'
"attorney at any time before or during the closing with
respect to zoning or building permits. All statements made
by the" vendors, Foote, or the vendors' attorney to the
vendees "were substantially true and the . . . [vendees]
do not complain of any spoken misrepresentation."

Mrs. Annino and Foote both represented to the vendees
"that the property . . . consisted of eight . . . furnished
apartments which were being rented to the public for
multi-family purposes. They knew that Kannavos' reason

---

[4] He had come to the United States in 1957 from Greece where he had re-
ceived the equivalent of a high school education. He learned to speak, read,
and write English after coming to the United States. Bellas, who was asso-
ciated with Kannavos in the purchase of 71–73 and 79 Ingersoll Grove was
about thirty years old. He was a produce manager in a chain grocery store,
who came to the United States in 1955 and learned to read and write English
at night school. He also had received the equivalent of a high school educa-
tion in Greece. He had no previous experience in real estate before these
events.

for buying the property was to rent the apartments to the public. . . . Kannavos had no prior experience with real estate. He was unaware of any zoning or building permit violation and would not have purchased the property if he had known of any such violation."

The sale of the other properties (71–73 and 79 Ingersoll Grove) occurred in substantially similar circumstances. Discussion of other property owned by the vendors started shortly before Kannavos acquired 11 Ingersoll Grove. The vendees saw an advertisement of the houses at 71–73 and 79 Ingersoll Grove in July, 1965, and then went to see them. Mrs. Annino and Foote "represented to . . . Kannavos and Bellas, that the property [71–73 and 79 Ingersoll Grove] was rented as multi-dwelling property and that Bellas and Kannavos could continue to operate it as multi-dwelling property. The . . . [vendees] continued to operate the buildings as multi-dwelling property up to and including the date of the hearing. The operation showed a profit . . . ." The vendors represented to Bellas that "71–73 [and] 79 Ingersoll Grove would be a good investment for him as rental multi-family real estate."

"By . . . registered letters dated July 26, 1965 . . . the city . . . notified Bellas and Kannavos with respect to . . . 79 Ingersoll Grove that the property was being used for multi-family purposes in violation of the building code and zoning ordinance . . . that the wiring was illegal and should be corrected by a licensed electrician with a valid building permit . . . and that the plumbing was in violation of the building code and should be corrected by a licensed plumber with a valid building permit . . . . By three registered letters of July 26, 1965 with respect to . . . 71–73 Ingersoll Grove, Bellas and Kannavos were notified by the Building Commissioner . . . of the same violations of zoning, wiring, and plumbing."

The two groups of vendees "had no actual knowledge of the zoning or building code violations until . . . notified" by the city authorities. The vendees promptly through

their attorney "notified the . . . [vendors] of the rescission of" each sale.

"Each property is worth substantially less if operated only as a single family dwelling instead of [as] a multi-family dwelling." The city has started civil proceedings "to abate the use of each property as [a] multi-family" dwelling.

From his subsidiary findings summarized above the master concluded, among other things, that the vendors made no actual spoken misrepresentations; that they "intentionally withheld" from the vendees that the operation of the buildings "was in violation of the zoning ordinance"; that the vendors "represented . . . that the buildings . . . were being used as multi-family dwellings and . . . in each case that the . . . [vendees] could continue" so to operate them; and that the vendees "would not have bought the real estate if . . . [they] had known of the violations of the zoning ordinance, or the building code." He also concluded that the vendees "relied upon representations of the . . . [vendors] and the appearances of the real estate in that it was being used for multi-family purposes" and that they "made no independent inquiry concerning any violation of the zoning ordinance or building code." [5]

From the master's subsidiary findings, we draw our own conclusions. See *Samia* v. *Central Oil Co.* 339 Mass. 101, 122; *Corrigan* v. *O'Brien*, 353 Mass. 341, 345–346. These subsidiary findings are amplified in minor respects by the master's conclusions just summarized which expressly are based upon his subsidiary findings.

1. We assume that, if the vendors had been wholly silent and had made no references whatsoever to the use of the Ingersoll Grove houses, they could not have been found to

---

[5] The master's ultimate conclusions were expressed in the alternative, viz. if the vendors' silence in "the circumstances constitute[s] an actionable misrepresentation and if" the vendees properly could rely on such misrepresentation, then the vendees are entitled to rescission; but, if the vendors' silence did "not constitute an actionable misrepresentation, or if" the vendees could not properly rely on the "misrepresentation by silence," then rescission could not be allowed.

have made any misrepresentation. See *Swinton* v. *Whitinsville Sav. Bank*, 311 Mass. 677, 678–679,[6] where this court affirmed an order sustaining a demurrer to a declaration in an action of tort brought by a purchaser of a house. The seller knew that the house was infested with termites and remained silent. This court (per Qua, J. at p. 678) said, "There is no allegation of any false statement or representation, or of the uttering of a half truth which may be tantamount to a falsehood. There is no intimation that the defendant by any means prevented the plaintiff from acquiring information as to the condition of the house. There is nothing to show any fiduciary relation between the parties, or that the plaintiff stood in a position of confidence toward or dependence upon the defendant. So far as appears the parties made a business deal at arm's length. The charge is concealment and nothing more; and it is concealment in the simple sense of mere failure to reveal, with nothing to show any peculiar duty to speak." The court (p. 679) indicated that it was applying a long standing "rule of nonliability for *bare nondisclosure*" (emphasis supplied).

As in the *Swinton* case, the parties here were dealing at arm's length, the vendees were in no way prevented from acquiring information, and the vendors stood in no fiduciary relationship to the vendees. In two aspects, however, the present cases differ from the *Swinton* case: viz. (a) The vendees themselves could have found out about the zoning violations by inquiry through public records, whereas in the *Swinton* case the purchaser would have probably discovered the presence of termites only by retaining expert investigators; and (b) there was something more here than the "bare nondisclosure" of the seller in the *Swinton* case.

(a) We deal first with the affirmative actions by the vendors, their conduct, advertising, and statements. Was

---

[6] The *Swinton* case may not represent the law elsewhere. See Restatement 2d: Torts, § 551 (Tent. draft No. 11, April 15, 1965), p. 43; Prosser, Torts (3d ed.), § 101, p. 711. Cf. discussions of situations in landlord and tenant cases like *Cutler* v. *Hamlen*, 147 Mass. 471, 474; *Stumpf* v. *Leland*, 242 Mass. 168, 172–174; *Cooper* v. *Boston Housing Authy*. 342 Mass. 38, 40. For general consideration of silence as misrepresentation, see Restatement: Restitution, § 8; Williston, Contracts (2d ed.) § 1497.

enough said and done by the vendors so that they were bound to disclose more to avoid deception of the vendees and reliance by them upon a half truth? In other words, did the statements made by the vendors in their advertising and otherwise take the cases out of the "rule of nonliability for bare nondisclosure" applied in the *Swinton* case?

Although there may be "no duty imposed upon one party to a transaction to speak for the information of the other . . . if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . ." See Harper & James, Torts, § 7.14. See also Restatement: Torts, § 529; Williston, Contracts (2d ed.) §§ 1497–1499. The existence of substantially this principle was assumed in the *Swinton* case, 311 Mass. 677, 678, in the first sentence of the passage from that case quoted above. Massachusetts decisions have applied this principle. See *Kidney* v. *Stoddard*, 7 Met. 252, 254–255 (a father represented that his son was entitled to credit but failed to disclose that the son was a minor; statement treated as a fraudulent representation); *Burns* v. *Dockray*, 156 Mass. 135, 137 (assertion that title was good [see *Lyman* v. *Romboli*, 293 Mass. 373, 374] but omitting to refer to the possible insanity of one whose incompetence might cloud title); *Van Houten* v. *Morse*, 162 Mass. 414, 417–419 (partial disclosure by a woman to her fiancé about a prior divorce). See also *International Trust Co.* v. *Myers*, 241 Mass. 509, 512–513; *White Tower Management Corp.* v. *Taglino*, 302 Mass. 453, 454–455; *Boston Five Cents Sav. Bank* v. *Brooks*, 309 Mass. 52, 55–56 ("Deception need not be direct . . . . Declarations and conduct calculated to mislead . . . which . . . do mislead one . . . acting reasonably are enough to constitute fraud"). Cf. *Wade* v. *Ford Motor Co.* 341 Mass. 596, 597–598.

The master's report provides ample basis for treating the

present cases as within the decisions just cited. The original advertisements in effect offered the houses as investment properties and referred to them as single houses converted to apartments. The investment aspect of the houses was emphasized by Foote's action in furnishing income and expense figures. There was an express assertion that 11 Ingersoll Grove was "being rented to the public for multi-family purposes" and that Kannavos and Bellas "could continue to operate . . . [the other properties] as multi-dwelling property." The master's conclusions indicate that this statement applied to all the properties.[7] The buildings were divided into apartments. The sales included refrigerators, stoves, and other furnishings appropriate for apartment use, as well as real estate. The vendors knew that the vendees were planning to continue to use the buildings for apartments, and yet the vendors still failed to disclose the zoning and building violations. We conclude that enough was done affirmatively to make the disclosure inadequate and partial, and, in the circumstances, intentionally deceptive and fraudulent.

(b) The second difference between these cases and the *Swinton* case is the character of the defect not disclosed. In the *Swinton* case, the presence of predatory insects threatened the structure sold. In the absence of any seller's representations whatsoever, there was no duty to disclose this circumstance, even though doubtless it would have been difficult to discover. In the present cases, the defect in the premises related to a matter of public regulation, the zoning and building ordinances. Its applicability to these premises could have been discovered by these vendees or by the vendees' counsel if, acting with prudence, they had retained counsel, which they did not. The bank mortgagee's counsel presumably was looking only to the protection of the bank's security position. Nevertheless, where there is

---

[7] In any event some discussions with respect to all these properties in the same neighborhood were going on about the same time and the later transaction appears to have been commenced either before or about the time the earlier one was completed.

reliance on fraudulent representations or upon statements and action treated as fraudulent, our cases have not barred plaintiffs from recovery merely because they "did not use due diligence . . . [when they] could readily have ascertained from . . . records" what the true facts were. See *Yorke* v. *Taylor*, 332. Mass. 368, 373. There this court allowed rescission because of the negligent misrepresentation, innocent but false, of the current assessed value of the property being sold. Here the representations made by the advertising and the vendors' conduct and statements in effect were that the property was multi-family housing suitable for investment and that the housing could continue to be used for that purpose. Because the vendors did as much as they did do, they were bound to do more. Failing to do so, they were responsible for misrepresentation. We think the situation is comparable to that in *Yorke* v. *Taylor*, 332 Mass. 368, 374, even though there the misrepresentation was "not consciously false" and here it was by half truth.

We hold that the vendors' conduct entitled the vendees to rescind. See *Yorke* v. *Taylor*, 332 Mass. 368, 371–372, 374; Restatement: Contracts, §§ 472, 489; Restatement: Restitution, § 28; Williston, Contracts (2d ed.) §§ 1497–1500. There was, in our opinion, much more than "bare nondisclosure" as in the *Swinton* case. Cf. *Spencer* v. *Gabriel*, 328 Mass. 1, 2; *Donahue* v. *Stephens*, 342 Mass. 89, 92.

2. There is no occasion to consider the arguments of the vendors concerning the interlocutory decrees overruling the demurrers. The cases have been fully tried. The facts found by the master support the final decree. See *Olszewski* v. *Sardynski*, 316 Mass. 715, 717; *Massachusetts Bar Assn.* v. *Cronin*, 351 Mass. 321, 324; *Selig* v. *Wexler*, 355 Mass. 671, 681.

3. It is represented in the briefs that fire damaged 71–73 Ingersoll Grove on November 4, 1967, after the original final decrees had been entered. The record discloses no facts concerning this fire or any claims to insurance proceeds. Before final decrees after rescript are entered, the Superior Court is authorized to determine whether modification of the relief

granted is appropriate in the light of this fire and other events occurring since the original final decrees.

4. The interlocutory decrees overruling the demurrers are affirmed. The final decrees are reversed so that there may be any necessary modification of the relief in accordance with part 3 of this opinion. The cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*