[782 NYS2d 66]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ALLAN CURRY, Appellant.

First Department, September 28, 2004

### APPEARANCES OF COUNSEL

*Andrew C. Fine, The Legal Aid Society*, Brooklyn (*Steven R. Berko* of counsel), for appellant.

*Robert M. Morgenthau, District Attorney*, New York City (*David M. Cohn* and *Gina Mignola* of counsel), for respondent.

### OPINION OF THE COURT

Tom, J.P.

Defendant was arrested in connection with the brutal beating of his ex-girlfriend. Complainant Maureen P. alleged that, while walking on the street, she was abducted by defendant and forcibly taken to his apartment. There, defendant raped and sodomized her, forcibly stole property from her person and intentionally inflicted serious physical injury over the course of many hours. Defendant was convicted of assault in the second degree and sentenced to a prison term of 15 years to life. The jury acquitted him of the additional charges in the indictment.

On appeal, defendant's primary contention is that his right to confront his accuser was abrogated by the trial court's misapplication of the Rape Shield Law (CPL 60.42). He further contends, inter alia, that his right to a fair trial was infringed by the court's *Sandoval* ruling. This Court concludes that the Rape Shield Law was properly applied, and that the *Sandoval* ruling was correct.

Complainant testified extensively about her relationship with defendant Allan Curry. She stated that they met in January 1996, started dating and became intimate. After being on a methadone maintenance program for 16 years, complainant resumed the use of heroin. She suspected that defendant was using crack cocaine because, she alleged, he became physically abusive, leading to their breakup at the end of the winter in 1996. Their relationship resumed in the summer, but it was unstable because, complainant stated, she "didn't want to be with Allan if he was messing around with the crack."

Although complainant had started living with another man, Hassan Sani, and defendant had allegedly made phone calls threatening her life, she began seeing defendant again, stating, "I cared for him, I loved him." Her relationship with Hassan

Sani also deteriorated because of physical abuse and ended with Sani's arrest in September 1997 for an assault upon complainant and his own brother.

Meanwhile, complainant continued to see defendant and possessed keys to his apartment. Their association remained tempestuous, however. On June 6, 1997, defendant gained access to her apartment building, rang her doorbell and made threats over the intercom.

On the pivotal evening of June 20, 1997, complainant took the subway to 135th Street to meet Hassan Sani "to see if I could get some more money off him so that I could cop some drugs." She arrived at the subway station, which "is across from where Allan [defendant] lives," at between 8:00 and 10:00 P.M. After she crossed the street on her way to buy ice cream at a local delicatessen, defendant came up behind her, stating that "he wanted to talk" with her. Defendant was carrying one of several briefcases he owned. When complainant indicated that she did not want to go to his apartment, defendant began by pushing her and then punched her in the head and back and pulled her by the hair. They ended up at the staircase of defendant's apartment building, where "he opened the door and he pushed me in and I fell forward." Defendant told complainant that he had a gun in his briefcase. He forced her through the inner door and towards his apartment, only a few feet away. He pushed her through the apartment door, where she fell again. He told her to take off her clothes and, after removing several dollars from one of her pockets, began having sex with her, hitting her and telling her, "this is for the nigger you are laying up with." She eventually ceased resisting "because I felt that with him hitting me as hard as he was, I felt it was easier to play it his way so I wouldn't be hurt any further." Over the course of the night, defendant beat her, struck her head, body and arms with his fist, slapped her around, and struck her leg with a broomstick. Defendant sodomized complainant and had sex with her numerous times throughout the night.

The apartment door was equipped with a lock that can only be opened with a key both inside and out. After defendant had forced complainant into the apartment, he locked the door and removed the key from the lock. Complainant, who was carrying her keys to the apartment in her hand when confronted by defendant, was unable to locate them once inside. At some point during the evening, defendant went out to buy crack, locking complainant in the apartment when he left. She stated that she

had "yelled and banged on the walls in his room asking for help," but no one responded.

In the morning, defendant told complainant that he was going out to get breakfast, warning her not to run "because I don't want to have to do this to you again." She told defendant that she was in a lot of pain and could barely walk. She was having trouble breathing. With that, defendant stated, "I'll leave you the key," and left the apartment at approximately 11:00 A.M. Complainant dressed and went straight to the side entrance of Harlem Hospital, located "across the street on Lenox Avenue."

The doctor who conducted the examination of complainant testified that she was in severe pain, primarily due to multiple fractured ribs. She also had a skull fracture of the left arch, together with bruising and laceration in the same area around the left eye. She had bruises on the lower chest, upper thighs and on the back of her right thigh and left shoulder. She complained of pain on deep breathing or coughing, and she lay very still, which the physician attributed to pain on movement. Due to the lack of discoloration in the bruises, he opined that the injuries had been sustained within the last 24 hours. He also noted that lab reports showed opiates in the blood. Complainant remained hospitalized for five days so that complications associated with multiple rib fractures, such as pneumothorax (that is, air in the chest cavity) and respiratory failure could be ruled out.

Sergeant Joseph Kenny interviewed complainant briefly at about 4:00 P.M. and, based upon information that she gave him, defendant was taken to the 32nd Precinct House for questioning. After complainant made an identification from a Polaroid photograph, defendant was placed under arrest. He made both a written and a videotaped statement, in which he conceded that he met complainant at about 8:30 P.M. on the evening of June 20th and that she remained at his apartment until he left for work at around noon on the 21st. He stated that complainant met him at his job on 125th Street. She "snorted some dope" before they took a cab to his apartment, arriving about 9:00 P.M. The statement continues: "I live on the first floor. I have a pole in the hallway. She said something to me so I pushed her and she stumbled and hit the pole. She was off balance and high. She hit right over her eye on the side." They had sex, and defendant "realized then that she was sore. I didn't see her bruises until she took her clothes off." He complained that "I gave her

$500 on Christmas. Back in January I call her and another man answered the phone. She used me." He left for work about 10:30 A.M., and complainant was gone when he returned at "about 12:30, one o'clock." In the videotaped statement, which was played for the jury, defendant described the evening as a night of pleasure and sex. He stated that he noticed bruises on complainant's legs when she undressed and that complainant told him that one of her "tricks" had beaten her.

When Sergeant Kenny went to search defendant's apartment, he observed what appeared to be blood on the pole in the hallway and spattered on the floor and the outer side of the apartment door. Inside, he found a notebook and a clump of red hair on the floor along with five condoms. He lifted up the mattress and found a set of keys belonging to complainant. He did not see blood inside the apartment. The officer vouchered items of clothing he found. An expert serologist testified that blood was found on complainant's brassiere.

A street peddler, who testified on behalf of the defense, stated that he saw defendant being arrested and recalled seeing him on 125th Street the night before. He remembered a woman named Maureen, who had red hair, in defendant's company for some two or three hours before defendant finished selling for the day at around 9:30 P.M., at which time she left with defendant in a cab.

Defendant's next-door neighbor testified that, during the summer of 1997, he saw complainant with a black eye, "Two three times coming to see him." On the last such occasion, he saw her sitting at the top of the steps waiting for defendant between five and six in the evening. Neither during the course of that evening nor at any other time did the witness ever hear yelling and screaming or banging noises coming from defendant's apartment.

Defendant's cross-examination of complainant elicited that she had written love poems and notes in the notebook that Sergeant Kenny had recovered from defendants's apartment. Her entries were made at a time she was allegedly living with Hassan Sani following Sani's release from prison in May 1997. Over objection, she read an entry, made in what complainant recognized as defendant's handwriting, that states:

> "Oh Lord, don't let me think about it or her, please.
> They say let go and let God. Don't let me think of
> her, please. I know what I should do. Forget it, for

the things she is doing she will die or someone will kill her it won't be long, time will tell."

Complainant was questioned extensively about her relationship with Hassan Sani, whom she met in August 1996 and who moved into her Brooklyn apartment a few weeks later. Sani also made a living as a street peddler, selling oils and incense, and he helped complainant pay the rent. He lived with her on and off for a year. In April 1997, he was arrested for striking complainant and banging her head against a wall, for which he spent over a month in jail. They reconciled with the understanding that Sani would seek counseling. However, the defense produced a statement in which complainant told an Assistant District Attorney that, since June 1997, Sani had repeatedly harassed and threatened her at home and at work. Complainant also acknowledged that Sani had been arrested for selling marijuana on July 28, 1997 and was again incarcerated. She had almost daily telephone calls from him until his release from Rikers Island on September 2nd of that year.

On September 27, 1997, a fellow employee walked complainant home from work, concededly because of her fear of Hassan Sani, and waited at the foot of the stairs while she went up to her third-floor apartment. Sani was waiting for her and pursued her as she ran down the stairs. All three went outside, where Sani pulled complainant's hair. Two days later, she returned home at 9:40 P.M. to find Sani and his brother waiting for her inside her apartment. Sani pulled her inside and ultimately picked up a knife from the kitchen table and swung it at her. Sani missed complainant, but at some time during the evening, possibly before her arrival, Sani stabbed his brother. Hassan Sani was arrested in connection with the assaults.

On summation, the defense argued that it was "Hassan Sani also known as Kevin Moore who has the history of rape and kidnaping." Counsel alluded to Sani's stabbing of his own brother, both in September 1997 and on a previous occasion in 1995, and to a 1991 incident in which "he had used a hypodermic needle on a woman . . . locked her in her house" and raped her. Counsel suggested that complainant had been beaten by Hassan Sani while under the influence of heroin, then went to see defendant and only began to experience pain when she awoke in his apartment the next morning. Counsel speculated that the reason complainant was writing love notes in defendant's notebook was that she knew he had received a payment of $8,550 from the government "and she wants to get her hands

on it so that she can continue buying her heroin." Counsel further stated that the only source of income sufficient to sustain complainant's $40-to-$80 daily heroin habit was the frequent monetary "gifts" received from a number of boyfriends.

The defense attacked the inconsistencies in complainant's account of the events of June 20 and June 21, 1997. Counsel remarked on the improbability that someone could be pulled by the hair along a residential street across from a hospital emergency room on a pleasant summer evening without anyone intervening or calling the police. Also noted was the lack of any explanation as to how defendant, who was supposedly holding on to a briefcase, was able to pull complainant along by the hair and strike her with his fists; or how he was able to remove his keys and open the apartment building's doors while pulling complainant by the hair, all the while carrying the briefcase. Furthermore, the substance found on the pole and elsewhere in the hallway was never clinically identified as blood. Nor was any blood noticed in the apartment itself, even on the sheets and pillow cases.

Defendant's primary contention on appeal is that he was erroneously precluded from questioning complainant with respect to the statement that she allegedly made to him that the injuries she sustained were inflicted by one of her "tricks." He argues that the statement serves to rebut the People's evidence (CPL 60.42 [4]) and that it should have been received as "relevant and admissible in the interests of justice" (CPL 60.42 [5]). In excluding the statement, defendant contends, the trial court committed the three errors delineated in this Court's decision in *People v Jovanovic* (263 AD2d 182 [1999], *appeal dismissed* 95 NY2d 846 [2000]): (1) failing to distinguish statement from conduct, (2) excluding an alternative explanation for the evidence of injury presented by the People and (3) precluding statements indicative of a motive to lie about the consensual nature of complainant's relationship with defendant.

Certain of defendant's present arguments were not addressed to the trial court and, therefore, are not preserved for review. Particularly, his contention that evidence of complainant's sexual history should have been admitted to rebut the People's evidence that defendant caused her injuries (CPL 60.42 [4]) was not raised at trial. Also unpreserved is defendant's present claim that such evidence should have been allowed because it would have impacted on the complainant's motive to fabricate. The court's ruling did not impede the defense theory, which was

vigorously presented to the jury, and this Court therefore declines to reach defendant's unpreserved objections in the interest of justice. Even if we were to reach the merits of these unpreserved objections, we would conclude that the exclusion of evidence concerning complainant's other relationships struck the appropriate balance between protecting complainant's privacy while preserving defendant's ability to mount an effective defense (*Jovanovic* at 195).

Prior to trial, the People sought to exclude evidence of the victim's prior sexual history pursuant to CPL 60.42, otherwise known as the Rape Shield Law,* specifically her 1979 and 1981 convictions for prostitution-related offenses in violation of Penal Law § 230.00. In opposition, defendant argued that although they are "remote in time," he nevertheless should be permitted to offer evidence of the convictions in the interest of justice on the ground that such evidence is relevant to his defense. Counsel argued that defendant's videotaped statement contains "statements that the complaining witness may have previously indicated that she is currently prostituting herself and that the bruises that were on her legs and on her ribs were inflicted perhaps by tricks, as opposed to Mr. Curry, so that's part of our defense."

Supreme Court properly applied the Rape Shield Law to exclude evidence of limited probative value to obviate an unwar-

---

\* "§ 60.42 Rules of Evidence; admissibility of evidence of victim's sexual conduct in sex offense cases

"Evidence of a victim's sexual conduct shall not be admissible in a prosecution for an offense or an attempt to commit an offense defined in article one hundred thirty of the penal law unless such evidence:

"1. proves or tends to prove specific instances of the victim's prior sexual conduct with the accused; or

"2. proves or tends to prove that the victim has been convicted of an offense under section 230.00 of the penal law within three years prior to the sex offense which is the subject of the prosecution; or

"3. rebuts evidence introduced by the people of the victim's failure to engage in sexual intercourse, deviate sexual intercourse or sexual contact during a given period of time; or

"4. rebuts evidence introduced by the people which proves or tends to prove that the accused is the cause of pregnancy or disease of the victim, or the source of semen found in the victim; or

"5. is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its findings of fact essential to its determination, to be relevant and admissible in the interests of justice."

ranted excursion into complainant's sexual history. In a prosecution for a sexually based offense, the Rape Shield Law bars evidence of a victim's sexual conduct, unless the victim has been convicted of prostitution within the past three years (CPL 60.42 [2]). The convictions for offenses committed some 20 years prior to the alleged rape were properly barred as falling outside the statutory exception.

Defendant's reliance on *People v Jovanovic* (263 AD2d 182 [1999], *supra*) is misplaced. In that case, the prosecution introduced redacted e-mail communications between the defendant and the complainant, presenting "a compelling story of a woman being drawn into a cyberspace intimacy that led her into the trap of a scheming man" (263 AD2d at 189). The complainant alleged that when she went to the defendant's apartment after they first met, she was "tied up, sodomized with a stick, hit with a baton, and burned" by him (*id.*). However, portions of several e-mail messages, which had been redacted by the court pursuant to the Rape Shield Law, indicated that the complainant sought out sadomasochistic relationships and was presently involved in such a relationship with a man other than the defendant, identified only as Luke. This Court noted the distinction between evidence of a complainant's prior sexual conduct, which the Rape Shield Law precludes, and evidence of *statements* concerning prior sexual conduct, which the law does not exclude (*id.* at 193-194). Because the injuries sustained by the complainant could have been inflicted by Luke on a previous occasion, the evidence was held admissible under the fourth exception to the Rape Shield Law as tending to rebut evidence that the accused was the source of complainant's injuries (*id.* at 196) and on the ground that it was admissible in the interest of justice as being highly relevant to establishing the defense that the complainant "concocted her accusation" to conceal from Luke her sadomasochistic relationship with the defendant (*id.* at 198).

The circumstances of the matter at bar bear only a superficial resemblance to those of *Jovanovic*, which aptly illustrates the principle that relating only part of the truth can accomplish a deception as effectively as presenting a complete fabrication (*see Kannavos v Annino*, 356 Mass 42, 48, 247 NE2d 708, 711-712 [1969] ["half-truths may be as actionable as whole lies"]). *Jovanovic* deals with the admissibility of statements made by a complainant concerning her prior sexual conduct. Here, the statement in contention is not one made by complainant but by

defendant. Defendant did not seek to introduce a statement complainant had made for its evidentiary value; defendant merely sought to use her alleged statement as a means to elicit testimony from complainant as evidence-in-chief, which defendant presumes would have rebutted the People's evidence that he caused complainant's injuries. This would appear to be precisely the sort of speculative foray into a victim's sexual history that the Rape Shield Law was designed to prevent.

Notably, defendant does not contend that any statement was withheld from the factfinder. Defendant's videotaped statement was played for the jurors, who heard him assert that complainant alleged that she had been beaten by one of her tricks. It is defendant's appellate contention that he was prejudiced by the inability to further examine complainant with respect to this potential source of injury during cross-examination; however, this desire was never made known at trial. The colloquy surrounding the People's application to bar testimony concerning complainant's prostitution convictions is devoid of any specific request by defendant to inquire about this statement. Thus, even assuming that a statement merely alleged to have been made by a victim but not received into evidence might implicate the accused's Sixth Amendment right to confront a witness, the need to distinguish between excluded sexual conduct and a *statement* with respect to sexual conduct was never presented to the court. Similarly, the assertion that the statement is relevant to complainant's motive to fabricate by concealing her relationship with defendant from Hassan Sani is raised for the first time on appeal.

Rather than being "highly relevant" to his defense, as defendant now urges, complainant's alleged statement played only a peripheral role as an alternative explanation for "the cause of . . . disease of the victim" (CPL 60.42 [4]), a concept which includes injury (*Jovanovic*, 263 AD2d at 196-197). At trial, complainant's injuries were attributed not to some unidentified prostitution client but to a known assailant, particularly, Hassan Sani, who, counsel told the jurors, "has no compunction about giving her a beating." Complainant was cross-examined extensively about her relationship with Sani, her fear of him and his incarceration for assaulting her. Sani was portrayed as a violent individual, who was feared by complainant and who had a history of aggression towards her. Only after counsel named Sani as the probable assailant did he refer to complainant's statement, telling the jurors, "So he claimed from the start that

these bruises were already there. And she told him allegedly that these bruises were as a result of a trick."

In context, counsel's reference to the statement served the limited purpose of bolstering the defense claim that Hassan Sani inflicted complainant's injuries. The reference merely served to draw the jurors' attention to its consistency with defendant's observation that complainant's injuries had been received previously. In short, though it was briefly alluded to during the application to preclude evidence of complainant's prostitution-related convictions, nothing in the trial transcript suggests that the defense ever sought to examine complainant concerning any statement she might have made attributing her injuries to some unidentified third party.

The court's CPL 60.42 ruling notwithstanding, defendant's summation conveyed the strong impression that the source of complainant's income was money received from so-called boyfriends; that she carried on simultaneous intimate relationships with both defendant and Hassan Sani; and that Sani had a propensity for violence towards her and, indeed, was arrested for an assault on her and the stabbing of his own brother a few months after defendant's alleged assault. The defense therefore presented the jurors with a straightforward question of fact as to which of complainant's two paramours committed the assault.

The jurors clearly did not accept defendant's theory that complainant had been severely beaten at some point before she encountered defendant, by whatever means, and went to his apartment. They were not persuaded that complainant could have traveled by subway to meet defendant, having sustained multiple rib fractures and a fractured skull when, 14 hours later, she was observed to have difficulty simply moving and breathing. Defendant does not, and cannot, plausibly argue that the record lacks substantial evidence to support the jury's resolution of the ultimate factual issue of guilt or innocence against him.

Although defendant's rendition of the events of June 20 and 21, 1997 differs from the account given by complainant, he admitted to police that he was with complainant for the 14 hours immediately prior to the time she appeared at the emergency room of Harlem Hospital. Defendant admitted causing the injury to her eye. Complainant's keys were found under the mattress in defendant's apartment, and a clump of her hair was found on the floor. Complainant had such severe rib fractures

with multiple bruises and abrasions over her body that she could hardly move and experienced difficulty breathing. She also had a skull fracture of the bone arch over the temple. Her injuries were sufficiently extensive that she required hospitalization for five days. Thus, defendant's admissions together with the physical evidence provide overwhelming evidentiary support for the jury's conclusion that the assault was perpetrated during the time that complainant was with defendant, not over 14 hours earlier.

As to the court's *Sandoval* (*People v Sandoval*, 34 NY2d 371 [1974]) ruling, this Court perceives no improvidence in permitting inquiry into the facts surrounding two prior convictions for assault. Defendant failed to meet his burden "of demonstrating that the prejudicial effect of the admission of evidence thereof for impeachment purposes would so far outweigh the probative worth of such evidence on the issue of credibility as to warrant its exclusion" (*id.* at 378). As this Court has observed, "that a defendant may specialize in one type of illegal activity . . . does not *ipso facto* shield such defendant from having prior convictions used to impeach his credibility" (*People v Rahman*, 62 AD2d 968, 968 [1978], *affd* 46 NY2d 882 [1979]; *People v Reid*, 190 AD2d 575 [1993], *lv denied* 81 NY2d 1078 [1993]). The similarity of the prior crimes does not require the court to bar inquiry into the underlying facts (*see People v Hayes*, 97 NY2d 203, 206 [2002]).

Defendant's procedural challenge to his adjudication as a persistent felony offender by the court is unpreserved (*see People v Brown*, 306 AD2d 12 [2003], *lv denied* 100 NY2d 592 [2003]), and this Court declines to reach it in the interest of justice. Nor do we perceive any basis for reducing the sentence.

Finally, defendant's CPL 440.10 motion was properly denied.

Accordingly, the judgment of the Supreme Court, New York County (Antonio Brandveen, J.), rendered June 4, 1999, convicting defendant, after a jury trial, of assault in the second degree, and sentencing him, as a persistent felony offender, to a term of 15 years to life, should be affirmed. The order, same court (Ronald Zweibel, J.), entered on or about February 5, 2002, denying defendant's CPL 440.10 motion, should be affirmed.

MAZZARELLI, SAXE and MARLOW, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 4, 1999, and order, same court, entered on or about February 5, 2002, affirmed.