[700 NYS2d 156]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v OLIVER JOVANOVIC, Appellant.

First Department, December 21, 1999

## APPEARANCES OF COUNSEL

*Mark Dwyer* of counsel (*Grace Vee* and *David M. Cohn* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Diarmuid White* of counsel (*Brendan White* on the brief, attorney), for appellant.

## OPINION OF THE COURT

SAXE, J.

On this appeal of his conviction for kidnapping, sexual abuse and assault, defendant Oliver Jovanovic asks us to examine certain issues regarding the application of the Rape Shield Law (CPL 60.42). We conclude that the trial court's evidentiary rulings incorrectly applied the Rape Shield Law and, as a result, improperly hampered defendant's ability to present a defense, requiring reversal of his conviction and remand for a new trial.

The criminal charges arose from a date between Jovanovic and the complainant which took place after weeks of on-line conversations and e-mail correspondence. This appeal focuses on a number of statements made by the complainant in e-mails sent to Jovanovic. In these statements, she indicated an interest in participating in sadomasochism. Defendant's purpose in seeking to offer these statements in evidence was not to undermine complainant's character by demonstrating that she was unchaste. Rather, it was to highlight both the complainant's state of mind on the issue of consent, and his own state of mind regarding his own reasonable beliefs as to the complainant's intentions.

Nevertheless, the trial court concluded that these statements were inadmissible under the Rape Shield Law. Initially, we hold that a careful reading of the statute discloses it to be inapplicable to much of the evidence precluded at trial. Moreover, the preclusion of this evidence improperly interfered with defendant's right to confront witnesses. " '[C]riminal defendants

have * * * the right to put before a jury evidence that might influence the determination of guilt' " (*Taylor v Illinois*, 484 US 400, 408 [citation omitted]), and the trial court's discretion to exclude evidence must be "circumscribed by the defendant's constitutional rights to present a defense and confront his accusers" (*People v Hudy*, 73 NY2d 40, 57). Accordingly, we hold that a new trial is required.

## The Evidence at Trial

The People's case against Jovanovic was primarily founded upon the testimony of the complainant. She told a detailed story of becoming acquainted with Jovanovic through communications over the Internet, both by e-mail and by so-called "instant messages,"[1] as well as in a number of lengthy telephone conversations.

Their first contact took place during the summer of 1996. The complainant, a Barnard undergraduate who was home for the summer in Salamanca, a small town in upstate New York, went on-line and logged onto a "chat room" called "Manhattan," hoping to find other Columbia students there. In the course of a general discussion, she received an "instant message" from Jovanovic, and embarked upon a long, "instant message" private conversation with him. Their first conversation quickly took on an intimate tone; for instance, in response to Jovanovic's information that he studied molecular genetics and computational biology at Columbia and ran a small multimedia design firm with his brother, the complainant said "I may love you, hold a sec while I check the profile." When they shortly discovered that they both spent a lot of time in a particular building at Columbia, the complainant referred to "destiny" and asked "want to have coffee?"

In this first conversation, Jovanovic indicated his interest in the grotesque, the bizarre, and the occult. He mentioned Joel-Peter Witkin, explaining that Witkin creates photographs using corpses; he mentioned Eris, the Greek goddess of discord, and a group called the "Discordians" who, he said, try to "open people's eyes." The complainant brought up her interest in snuff films (i.e., films in which a person is killed), and her thoughts of making such a film herself.

Then, on October 9, 1996, the complainant sent Jovanovic an e-mail reminding him of their previous conversation, and raised

1. "Instant messages" differ from e-mail in that they are used only when both people are on line simultaneously, and the messages, when sent, appear directly on the computer screen of the recipient, rather than going to a "mailbox" for later retrieval.

again the subjects of snuff films and pagan rituals. He responded by e-mail (from Seattle) the next day, and she e-mailed back immediately. His next e-mail was on October 16, 1996, by which time he had returned to New York. She responded right away, continuing the tone of her earlier correspondence with him ("bring me anything back from Seattle?"). He did not write again until October 20, 1996. When she responded that evening, she (among other remarks) asked how tall he was.

He did not reply until November 10, 1996, when he asked "As for my height, why? Are you looking to be dismembered by a tall, dark stranger, or something of that sort? I'm sometimes strange and dark, but of average height, so perhaps you should look elsewhere. <g>"[2] When the complainant responded that same day, she wrote of the Columbia tunnels and their appropriate ambience for a snuff film. She asked if he had any ideas for murder plots. He responded the next day, November 11, 1996, with the suggestion that a film could be made of the true story of Sharon Lopatka (a woman who was killed in October 1996, allegedly by a man whom she had just met in person after developing an on-line relationship with him).

Their exchange of e-mail between November 13, 1996 and November 14, 1996 continued discussing fantasies for snuff films, and the complainant's purported interest in what she termed "a tall dark dismember-er."

In the complainant's e-mail of November 17, 1996, just after midnight, she told about having dragged a girl she knew to the emergency room after the girl was raped the previous night. The complainant's long message ended by describing herself as distraught. Jovanovic responded shortly thereafter with his phone number and an invitation to call if she wanted. She responded with "hey * * * is this a plot to begin dismemberment," and equivocated about calling him. His e-mail replied "it's up to you, just realize that it is an option."

The next night, November 18th, the complainant's e-mail "explained" to Jovanovic her connection to the girl whom she had said was raped. The complainant told how she "fingered"[3] and then spoke to "one Luke, who was attached to one skitzophrenic [sic] stalker x-intrest [sic] d'amour." It was developed

---

2. <g> is used to mean "grin" in on-line shorthand.

3. The complainant used the word "fingered" to indicate initiating an on-line conversation with a person she didn't previously know, whose user ID she obtained from a Columbia on-line ID directory.

in testimony that the complainant had initiated an on-line conversation with Luke on October 31, 1996, and began an in-person intimate relationship with him shortly after that, and that Luke's ex-girlfriend, Karen K., became jealous. It was this ex-girlfriend, Karen, whom the complainant brought to the hospital, following a telephone call in which Karen claimed to have been raped. Luke's trial testimony advanced his belief that when Karen telephoned the complainant and said she had been raped, she was motivated by a desire to interfere with his relationship with the complainant, whom he was supposed to meet with on the night of the phone call.

After Jovanovic sent an e-mail asking for details of the story she had told him about Karen and Luke, on the night of November 19, 1996 the complainant sent him a long e-mail in which she provided more information about the afternoon (November 1, 1996) when she had logged in and found e-mail from Luke and from Karen, whose e-mail had warned her to stay away from Luke.

The complainant's e-mail to Jovanovic on November 20, 1996 asked "So Oliver, you keep mentioning film after film, but where pray tell am I supposed to find them?" She also indicated an intense desire to know more about him, and spoke of "too many taboos surrounding the questions I want to ask." Two hours later he replied "Taboos are meant to be broken. * * * You'll simply have to ask more questions. Of course, that way lies dismemberment." Soon after that, still on November 20, 1996, she e-mailed back, "I think you may just be toying with the idea of dismemberment" and told him that she has to push herself, see how far she can take it, testing her limits. She also warned, "arms and legs are not toys" and that "It could get sick. And just may."

After more e-mails back and forth during the late night/early morning hours of November 21, 1996, at about 2:30 A.M., the complainant referred to things getting "kind of intimate," and then, at about 5:00 A.M., Jovanovic ended his message with "Should I call you, or you call me." That afternoon her e-mail message included her phone number, with the message that she would be home around 3:00 that night.

He called at about 3:00 A.M. on November 22nd, and they spoke for approximately four hours. According to the complainant's trial testimony, Jovanovic invited her to see a movie with him that night, and she gave him the address of her dormitory.

## The Complainant's Narrative of the Events of November 22-23, 1996

Jovanovic arrived at 8:30 P.M. on November 22, and suggested that they get something to eat. When they finished dinner at around 10:15, he said it was too late for the movie they had agreed upon, and asked if she wanted to see a video at his apartment instead. She said "I don't know"—explaining in her testimony that although she did not want to, she has trouble being assertive. Finally she agreed. He drove to three video rental outlets, but did not find what he wanted. He said he had some videos at his apartment, which was located in Washington Heights, and they proceeded to drive there, arriving at about 11:30 P.M.

Jovanovic gave her some tea, which she found to have a chemical taste, and a book of photographs by Joel-Peter Witkin, depicting corpses placed in grotesque poses. They watched a video entitled "Meet the Feebles," in which Muppet-like characters engage in sexual or violent behavior. During the movie, Jovanovic left the room and returned with some strips of fabric, which he placed next to the futon they were sitting on.

When the movie was over, she said it was getting late and she should go, but they began a conversation that ranged from the subjects of East Timor, media control of the news, and religion, to the subject of people with multiple personalities. Jovanovic told her he had another personality called the "Wise Philosopher" whom he can turn into when he encounters pain. To demonstrate, he told her to twist his wrist, which she did; she testified that he appeared to be "in" a personality that did not feel pain.

When he introduced the subject of good and evil, the complainant told him that she did not believe that evil existed. He looked stern, and in a voice she also characterized as "stern," told her to take off her sweater. He then repeated this directive in a louder voice. The complainant testified that she did not know what to do, thought it was a joke, but nevertheless removed her sweater. Then he told her to take off her pants, and she complied. He instructed her to lie down, and he tied her legs and arms to the frame of the futon, one limb to each corner; she explained that she did not protest because she did not know what to think.

Jovanovic went to the kitchen and came back with some candles, including a white candle in a glass. He sat between

her legs and lit the candle in the glass. At this point, the complainant testified that she protested, asking him not to burn her, telling him to untie her and demanding that he stop. However, when the glass was full of molten candle wax he dumped it on her stomach. She again protested, but he waited for the glass to fill with wax and then poured it on her stomach. Next, he pulled her panties away and dripped wax around her vaginal area, and after her bra popped open spontaneously, he poured wax on her nipples too. Then he took some ice cubes and placed them wherever he had poured the wax. She screamed and told him to stop, but his response was to ask why she was screaming, and to say that suffering was a human condition. At one point he gagged her and then blindfolded her. Next, he proceeded to bite her nipples and her collarbone.

After about an hour of this behavior, he left the apartment to move his car. When he returned, he cut the ties, picked her up and carried her to his bed. The complainant said, "don't rape me, don't dismember me, don't kill me." He replied, "is there anything else you don't want me to do?" She said, "yes, don't do anything you can get arrested for." When Jovanovic responded, "do you think I'm going to get arrested for this?" the complainant replied that he was going to have to kill her if he did not want to get arrested. He said "that's easily enough done," and pinched her nose shut and put his hand over her mouth for a minute, until she felt a bit dizzy.

Jovanovic then began to speak to the complainant about the need for women to learn self-defense, illustrating his point by noting that the only victim who was able to escape from noted murderer Jeffrey Dahmer was a person proficient in martial arts. At some point, unclear from the complainant's narrative, he hog-tied her, so she was on her stomach with her hands and feet tied together behind her back.

He next retrieved two batons from the closet, turned her on her stomach, and penetrated her rectum with either a baton or his penis, causing the complainant intense pain.

The complainant's next memory was of waking some time on Saturday, November 23, 1996, still hog-tied. Jovanovic untied her for a time and attempted to give her some instruction in self-defense. When she tried to run, he tied her up again.

Then, that evening, while Jovanovic was trying to look at her genitals, the complainant found that she was able to untie her legs, and stood up. The complainant testified that he then looked frightened. At this point, although she said he still sought to restrain her, she continued to run and to fight him

off, all the while putting on her pants, sweater, and boots, picking up her bra, panties and a sock, unlocking the apartment door and finally escaping.

## Subsequent Events

The complainant took the subway to her dormitory at about 10:00 P.M., fell asleep, woke up, showered, and after Luke called her at 1:00 A.M., she went to Luke's apartment, where she reported to him that she had been tied up, sodomized with a stick, hit with a baton, and burned by Jovanovic. The next morning she returned to her dormitory.

On Sunday night, November 24, 1996, she logged on to the computer at her school library and retrieved an e-mail message sent by Jovanovic the night before at 10:35 P.M. In it, he said she had forgotten her gold chain when she left the apartment, and that he could mail it if she gave him her zip code, or he could drop it off. He also said, "I have a feeling the experience may not have done you as much good as I'd hoped, because you weren't acting much smarter at the end than you were at the beginning." He closed with the words, "I hope you managed to get back all right."

The complainant sent Jovanovic a long e-mail the following day, in which her remarks included assertions that she was "purged by emotions, and pain," and that she was "quite bruised mentally and physically, but never been so happy to be alive." She said "Burroughs best sums up my state * * * the taste is so overpoweringly delicious, and at the same time, quite nauseating."

They continued their on-line communications later that day.

## The Redacted Statements

With the foregoing narrative by the complainant, the People were able to present to the jury a compelling story of a woman being drawn into a cyberspace intimacy that led her into the trap of a scheming man. However, its compelling quality was due in part to its one-sided and unbalanced nature. This imbalance resulted from the trial court's ruling precluding Jovanovic from effectively challenging certain aspects of the complainant's presentation. Where he should have been given free rein to explore the complainant's truthfulness, her accuracy in relating her experiences and her grip on reality, he was instead precluded from inquiring into several highly relevant statements contained in the complainant's e-mails to him.

The following discussion sets forth the portions of the complainant's e-mails to defendant that were subject to the court's preclusion order.

### First Redacted E-Mail

On November 17, 1996, in the complainant's e-mail to Jovanovic, she told him of "dragging" a girl to the emergency room after the girl reported that she had been raped. After further additional messages were sent back and forth between the two that same evening, on November 18, 1996, the complainant wrote to explain to Jovanovic how, over the Internet, she had first made contact with Luke, who she described as "attached to one skitzophrenic [sic] stalker x-intrest [sic] d'amour." One sentence was deleted from this e-mail. It read, "So said intrest [sic] plotted my death as well as a means of getting attention, thus the rape."

### Second Redacted E-Mail

Jovanovic's e-mail of November 18, 1996 requested to hear more details, and on November 19th, the complainant sent Jovanovic a long message relating how she became involved with Luke. She told of "fingering" Luke to chat with, and how Luke's "x-intrest [sic]," Karen, was unhappy about the complainant's new friendship with Luke and sent the complainant an e-mail warning her to stay away from him. The court deleted from this e-mail the following paragraphs, quoted here word for word (with misspellings and other errors left intact).

"the boy calls, tells lots and lots of a life led like burroughs: heroin addicted, bisexual atheist. My kinda comrad. so he seduced me. come to Ufm, I did[,] come to my appartment, I did[,] then he got me.

"Oh he sighed and pulled out an agonized tale of being young in Edinborough and on a field trip for highschool . . . there were 'very nice boys' (according to the chaperons) who worked at the hotel, so said chaperons let luke and his teen friends hang out with the big boys for a night on the town. Unfortunately for poor luke, one took a liking to him, (this is liking with twisted glint in the eye mind you). yes yes, so young man took young boy (luke) to empty hotel room, tied him to bed, straddled his ass, knife to throat, no protection, come in all the way and make it good . . . made it good. pull out laugh leave him tied and naked and lock the door behind you. Luke managed to get free, had to hand in his key to same man the next day at check out. the man smiled that sick 'nordic grin' and winked.

" 'oh wow' I perked up all the time thinking snuff film snuff film snuff film murder plot present, I presented offer of assistance. Luke said sure, then told me more, about his old boyfriend gillian, what he taught him. and about ginger and this one dominatrix who lives on the 10th floor."

### Third Redacted E-Mail

Jovanovic answered, shortly thereafter on November 19th, "[t]hen he got you? How suspenseful," although the court precluded the first four words, "[t]hen he got you?" The complainant's response, on November 20th, contained a further personal confession that the court also deleted from the evidence, in which the complainant had replied, "No duh, there's more, more interesting than sex, yes he did catch me, no sex, but he was a sadomasochist and now I'm his slave and its [sic] painful, but the fun of telling my friends 'hey I'm a sadomasochist' more than outweighs the torment."

### Fourth Redacted E-Mail

· Jovanovic's responsive e-mail on November 20th said, "You're submissive sometimes? Should have told me earlier." The complainant's next message in reply, also on November 20th included the following critical information, which was also redacted: "and yes, I'm what those happy pain fiends at the Vault call a 'pushy bottom'."[4]

While the vast majority of the electronic correspondence between Jovanovic and the complainant was introduced into evidence, the preclusion of the foregoing statements, particularly the last three, had an enormous impact on the defense. Basically, it left the jury with a distorted view of the events. Moreover, in the absence of proof that Jovanovic had reason to believe, prior to their meeting, that they both had intended to participate in consensual, nonviolent sadomasochism that night, his ability to testify in a credible manner as to this defense was irreparably impaired. Indeed, the limitation imposed by the court served to insulate the complainant from being fully cross-examined even as to those statements which were admitted into evidence, which evinced or implied some degree of interest in sadomasochism.

These messages were ruled inadmissible on the ground that they were covered by the protection of the Rape Shield Law

---

4. The defense explains that The Vault is a club catering to sadomasochists, and a "pushy bottom" is a submissive partner who pushes the dominant partner to inflict greater pain.

(CPL 60.42), in that they constituted evidence of the complainant's prior sexual conduct, having the effect of demonstrating her "unchastity." In addition to the messages themselves, based upon the trial court's understanding of the Rape Shield Law, Jovanovic was precluded from questioning either the complainant or Luke as to whether the two had mutually engaged in consensual sadomasochism. Although the court ultimately permitted Jovanovic to ask Luke whether he had caused the bruise Luke noticed on the complainant on November 24, 1996, the defense was not permitted to inquire further into whether Luke's own conduct toward the complainant at any prior time had caused any bruising.

For the following reasons, we conclude that the Rape Shield Law (CPL 60.42) does not support the ruling precluding Jovanovic from inquiring into the full complement of the complainant's statements to him.

## The Statute

The Rape Shield Law represents a rejection of the centuries-old legal tradition holding that, as Professor Wigmore stated, "the character of a woman as to chastity is of considerable probative value in judging the likelihood of [her] consent" (1 Wigmore, A Treatise on the Anglo-American System of Evidence in Trials at Common Law § 62, at 464 [3d ed 1940]). No longer does our society generally accept the premise that a woman who is "unchaste," i.e., unmarried and sexually active, is more likely than a "chaste" woman to consent to the sexual advances of any man (*see, People v Williams*, 81 NY2d 303, 312; Ordover, *Admissibility of Patterns of Similar Sexual Conduct: The Unlamented Death of Character for Chastity*, 63 Cornell L Rev 90, 97-102). It is because society now views such evidence as generally irrelevant that the Legislature enacted a law prohibiting the use of such evidence: the law "bar[s] harassment of victims and confusion of issues through raising matters relating to the victims' sexual conduct that have *no proper bearing* upon the defendant's guilt or innocence" (Preiser, Practice Commentaries, McKinneys Cons Laws of NY, Book 11A, CPL 60.42, at 9 [emphasis added]; *see also*, Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum L Rev 1, 15-22). Thus, it is critical to the theory behind the Rape Shield Law that evidence of the victim's character for chastity is generally irrelevant to a rape prosecution.

In accordance with this premise, CPL 60.42 provides that,

"Evidence of a victim's *sexual conduct* shall not be admissible in a prosecution for [a sex] offense or an attempt to commit [a sex] offense unless such evidence:

"1. proves or tends to prove specific instances of the victim's prior sexual conduct with the accused; or

"2. proves or tends to prove that the victim has been convicted of [prostitution] within three years prior to the sex offense which is the subject of the prosecution; or

"3. rebuts evidence introduced by the people of the victim's failure to engage in sexual intercourse, deviate sexual intercourse or sexual contact during a given period of time; or

"4. rebuts evidence introduced by the people which proves or tends to prove that the accused is the cause of pregnancy or disease of the victim, or the source of semen found in the victim; or

"5. is determined by the court after an offer of proof by the accused outside the hearing of the jury, or such hearing as the court may require, and a statement by the court of its findings of fact essential to its determination, to be relevant and admissible in the interests of justice" (emphasis added).

' The importance of this statute is in no way diminished by the discussion and conclusions that follow. We fully recognize that a woman's character or reputation for chastity is irrelevant to a charge that she was sexually assaulted. Our holding is simply that the Rape Shield Law, by its terms, is inapplicable to the evidence the trial court held to be inadmissible.

Initially, we hold that the redacted e-mail messages were not subject to the Rape Shield Law because they did not constitute evidence of the sexual *conduct* of the complainant. Rather, they were merely evidence of *statements* made by the complainant about herself to Jovanovic.

The distinction between evidence of prior sexual *conduct* (to which the statute expressly applies), and evidence of *statements concerning* prior sexual conduct, is more than merely semantic. Direct evidence of a complainant's *conduct* with others would generally be introduced (if admissible) as a basis to infer that she had voluntarily behaved in such a way on prior occasions with others. In contrast, the use of a statement is not so straightforward. It is frequently relevant not to prove the truth of the matter stated, but rather, for the fact that the speaker made the statement. That is, a statement may be relevant as proof of the speaker's, or the listener's, state of mind.

For instance, here, the complainant's statements to Jovanovic regarding sadomasochism were not necessarily offered

to prove the truth of what she said, i.e. that she actually was a sadomasochist. Rather, much of their importance lay in the fact that she chose to say these things to Jovanovic in the context of her electronic, on-line conversation with him, so as to convey to him another message, namely, her interest in exploring the subject of such activities with him.

This distinction between evidence of sexual conduct and evidence of statements concerning past or contemplated sexual conduct has been recognized by other jurisdictions with similar Rape Shield Laws. For instance, in *State v Guthrie* (110 NC App 91, 428 SE2d 853), a letter written by the complainant to a third party, proposing sex, was held to be evidence of conversation, not of a sexual act, and therefore was not barred by that State's Rape Shield Law (*see also, Commonwealth v Killen*, 545 Pa 127, 133, 680 A2d 851, 854 [Rape Shield Law does not preclude evidence of sexually provocative statements made by the complainant after the alleged attack, one to a man who rode with her in the ambulance and another to the emergency room physician]; *Doe v United States*, 666 F2d 43 [testimony as to the content of telephone conversations between the victim and the defendant not excluded by the rule]).

In this State, although no holding has clearly drawn an absolute line of demarcation between prior sexual conduct and statements concerning prior sexual conduct, the Rape Shield Law has been held inapplicable to (1) a complainant's statement to the defendant that she " 'was out to get laid that night' " (*People v Hauver*, 129 AD2d 889, 890), and (2) a complainant's prior claims of rape (*see, People v Harris*, 132 AD2d 940, 941). Additionally, *People v Kellar* (174 AD2d 848, 849, *lv denied* 78 NY2d 1128) draws the distinction between statements and conduct in discussing the circumstances under which CPL 60.42 (3) permits a defendant to rebut prosecution evidence that the victim had not engaged in sexual conduct with others. The *Kellar* Court explained that in the face of testimony that the victim was a virgin at the time of the incident, CPL 60.42 (3) entitles the defendant to offer evidence rebutting that showing; whereas, if the victim testified that she merely *told the defendant* that she was a virgin, the defendant would *not* be entitled to offer rebuttal evidence on that point under CPL 60.42 (*see, People v Kellar, supra*).

Were the complainant's statements framed as mere fantasies or secret desires, rather than as reports of her prior activities, there would have been no question that the Rape Shield Law would be inapplicable, since such statements reflect only

thoughts and not actions. Yet, in this context, the two types of statements are more similar than not. That her communication took the form of reports about her purported experiences should not transform a highly relevant statement into a protected one.

We therefore conclude that for all the foregoing reasons, the e-mail statements ruled inadmissible by the trial court were not covered by the Rape Shield Law. However, even assuming, arguendo, that no distinction could properly be made between prior conduct and statements *about* prior conduct, we would still hold that the Rape Shield Law does not support the preclusion of the e-mails at issue, because we conclude that these statements fall within a number of the exceptions set forth within the statute.

### Applicability of the Statute's Exceptions

Although the Rape Shield Law is grounded upon a recognition that evidence of a victim's character for chastity is generally irrelevant to a rape prosecution, even the drafters of Rape Shield legislation recognized that information about the victim's past sexual conduct is not *always* irrelevant (*see generally*, Berger, *Man's Trial, Woman's Tribulation, op. cit.*, at 57-69). Indeed, the inclusion of exceptions within CPL 60.42 is due to our Legislature's recognition of the possibility that certain types of sexual history evidence will be relevant. The bill was specifically drafted "to strike a reasonable balance between protection of a victim's privacy and reputation while not infringing on the defendant's right to a fair trial based on the presumption of innocence" (Mem of Assemblyman Fink, 1975 NY Legis Ann, at 48). A blanket exclusion which covered clearly *relevant* sexual conduct evidence would unduly circumscribe a defendant's constitutional right to cross-examine witnesses and present a defense (*see, People v Williams, supra*, at 312). Consequently, for instance, "the bill deems proof of the victim's past sexual conduct with the accused or acts of prostitution as relevant" (Mem of Assemblyman Fink, 1975 NY Legis Ann, at 48), and, accordingly, creates an exception for such evidence. By the same token, the "interests of justice" exception contained in subdivision (5) of the statute was included to ensure that relevant evidence not otherwise admissible could be introduced.

Turning to the redacted communications from the complainant to Jovanovic, even if the precluded statements were viewed as evidence of the complainant's prior sexual conduct, they fall

within several of the exceptions contained in the statute. First, given the highly intimate nature of some of this information, the statements, as a practical matter, should be viewed as the equivalent of "prior sexual conduct with the accused" (subd [1]). These statements, made to Jovanovic in the context of a relationship being developed on-line, as part and parcel of the ongoing conversation that led up to their in-person encounter, are really part of the complainant's verbal repartee with him, in which each participant tells the other of their interests and preferences. Viewed with the purpose of her statements in mind, even if the Rape Shield Law were to apply to statements, the redacted statements should therefore have been held to be admissible as falling within the first exception to the Rape Shield Law (CPL 60.42 [1]).

The exception for past conduct with the accused is included in the statute because a "history of intimacies" would "tend to bolster a claim of consent" (Berger, *op. cit.,* at 58; *see also, People v Westfall*, 95 AD2d 581, 583). The statements here, especially in view of their intimate nature, have the same sort of potential of shedding light on the motive, intent, and state of mind of these two people in their subsequent encounter.

Secondly, those redacted e-mail statements that report the complainant's involvement in a sadomasochistic relationship with Luke were also admissible under CPL 60.42 (4), the exception for evidence tending to rebut the people's showing that the accused is the cause of "disease" of the victim. The People contended that Jovanovic's actions had caused various bruises on the complainant. Consequently, Jovanovic should have had the right to inquire into the complainant's statements indicating that at the time of the alleged incident she was in a master-slave relationship with someone else, particularly since she specifically stated that this conduct was "painful." Further, based upon this particular statement, the defense should also have been permitted to inquire of both the complainant and Luke as to whether Luke had caused bruising to the complainant in the days prior to the incident.

Although the wording of CPL 60.42 (4) concededly does not specifically include the word "injury," it is noteworthy that the memorandum of the bill's sponsor reflects an intent to include the concept of injury along with that of disease (*see,* Mem of Assemblyman Fink, 1975 NY Legis Ann, at 48). There is no support in the legislative history for a purposeful deletion of the word "injury," and it would be illogical to permit one defendant to introduce evidence rebutting a showing that he was

the cause of *disease* in the victim, but not permit another defendant to rebut a showing that he was the cause of the victim's injuries. No rational distinction can be made (*see, People v Mikula*, 84 Mich App 108, 269 NW2d 195). Indeed, in other jurisdictions it has been held that due process rights must encompass the right to offer evidence providing an alternative explanation for evidence presented by the State to prove that the accused caused a physical condition arising from the charged crime (*see, e.g., United States v Begay*, 937 F2d 515, 523; *State v Cressey*, 137 NH 402, 628 A2d 696).

Third, given the relevance of the redacted statements to the issues presented to the jury, even if none of the statute's other exceptions covered the complainant's statements to Jovanovic, the "interests of justice" exception of CPL 60.42 (5) would be applicable. That exception was included in order to give courts discretion to admit what was otherwise excludable under the statute, where it is determined that the evidence is relevant (*see*, Mem of Assemblyman Fink, 1975 NY Legis Ann, at 48).

Even if no other exception applied, the precluded communications from the complainant to Jovanovic were highly relevant. The defense did not seek to introduce them to demonstrate the complainant's "unchastity" and thereby impugn her character or her honesty. Instead, the fact that the complainant made these statements to Jovanovic is relevant to establish that she purposefully conveyed to Jovanovic an interest in engaging in consensual sadomasochism with him.

Because the jury could have inferred from the redacted e-mail messages that the complainant had shown an interest in participating in sadomasochism with Jovanovic, this evidence is clearly central to the question of whether she consented to the charged kidnapping and sexual abuse.[5] The People emphasize that it is not whether she initially consented

---

**5.** There is no available defense of consent on a charge of assault under Penal Law § 120.00 (1) and § 120.05 (2) (*contrast,* Penal Law § 120.05[5] [where lack of consent *is* an element]). Indeed, while a meaningful distinction can be made between an ordinary violent beating and violence in which both parties voluntarily participate for their own sexual gratification, nevertheless, just as a person cannot consent to his or her own murder (*see, People v Duffy*, 79 NY2d 611), as a matter of public policy, a person cannot avoid criminal responsibility for an assault that causes injury or carries a risk of serious harm, even if the victim asked for or consented to the act (*see, e.g., State v Brown*, 154 NJ Super 511, 512, 381 A2d 1231, 1232; *People v Samuels*, 250 Cal App 2d 501, 513-514, 58 Cal Rptr 439, 447, *cert denied* 390 US 1024; *Commonwealth v Appleby*, 380 Mass 296, 402 NE2d 1051; *State v Collier,* 372 NW2d 303 [Iowa]). And, although it may be possible to engage in criminal assaultive behavior that does not result in physical injury (*see*, Don-

that is relevant, but whether she withdrew her consent and whether defendant continued to act despite the withdrawal of consent. However, the strength of the evidence as to the extent to which the complainant initially indicated to Jovanovic an interest in participating in sadomasochism with him *is* relevant to a determination of whether that consent was withdrawn.

Furthermore, the e-mails Jovanovic received from the complainant, particularly her statements, "now I'm his slave and its [*sic*] painful, but the fun of telling my friends 'hey I'm a sadomasochist' more than outweighs the torment," and "yes, I'm what those happy pain fiends at the Vault call a 'pushy bottom,'" could illuminate Jovanovic's understanding and beliefs as to the complainant's willingness to participate in sadomasochism with him (*see, Doe v United States*, 666 F2d 43, *supra*), and, as such, are also relevant to Jovanovic's state of mind.

The redacted e-mail messages were also highly relevant to establishing the defense that the complainant concocted her accusation in order to explain to Luke either her failure to meet him that night, or her participation in sadomasochism with another man. Moreover, direct evidence that the complainant had a sadomasochistic relationship with Luke, to which evidence the Rape Shield Law would otherwise apply, should also have been admitted, under the interests of justice exception to the statute. Even in Professor Vivian Berger's groundbreaking article, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom* (77 Colum L Rev 1, 98-99), in which she discussed the need for rape shield laws, Professor Berger included among her suggested exceptions to rape shield statutes a situation where the evidence arguably showed that the complainant had a motive to fabricate the charge. Furthermore, although our Legislature did not include such an exception in this State's Rape Shield Law, the United States Supreme Court has held that in a rape/sodomy prosecution, evidence of the complainant's relationship with another man may be highly relevant to establish the defense that she lied about the consensual nature of the charged sexual activities out of

nino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 120, at 119), we need not address here whether consent to such conduct may constitute a defense, since the jury clearly found here that the complainant was physically injured. Defendant's claim that there is a constitutional right to engage in consensual sadomasochistic activity is, at the very least, too broad, since if such conduct were to result in serious injury, the consensual nature of the activity would not justify the result.

fear of jeopardizing that other relationship (*see, Olden v Kentucky*, 488 US 227).

While defendant was permitted to cross-examine the complainant and Luke so as to elicit that their relationship was "intimate," he was precluded from inquiring into the sadomasochistic nature of that connection. The ruling almost completely prevented Jovanovic from presenting the viable defense that the complainant had reason to fabricate the nonconsensual and violent elements of her story. Only through full cross-examination of the complainant, including the nature of her relationship with Luke, could defendant have " ' "expose[d] to the jury the facts from which [it] could appropriately draw inferences relating to the reliability of the witness" ' " (*Olden v Kentucky, supra*, at 231, quoting *Delaware v Van Arsdall*, 475 US 673, 680, quoting *Davis v Alaska*, 415 US 308, 318; *see also, State v Colbath*, 130 NH 316, 540 A2d 1212, 1217). That is, only if full inquiry were permitted into her assertion that she was in a sadomasochistic relationship with Luke could the jury have a basis from which to infer that the complainant had a motive to fabricate her accusation of a forcible, violent assault, in order to avoid any negative response from Luke resulting from her voluntary participation in sadomasochism with another man.

In addition, redaction of the long narrative in the second e-mail, in which the complainant told Luke's story of a sadistic sexual encounter, was not justifiable under the Rape Shield Law, as it did not report past conduct on the part of the complainant. In any case, it was highly relevant to the attempted defense that the claim of attack was concocted, particularly in view of the similarity between that narrative and Jovanovic's complained-of conduct on the night in question.

We conclude that the trial court's rulings erroneously withheld from the jury a substantial amount of highly relevant, admissible evidence. Furthermore, these errors were of constitutional dimension.

### The Sixth Amendment Right to Confront Witnesses

Cross-examination "is critical for ensuring the integrity of the fact-finding process" and is " 'the principal means by which the believability of a witness and the truth of his testimony are tested' " (*Kentucky v Stincer*, 482 US 730, 736; *Davis v Alaska*, 415 US 308, 316, *supra*). The trial court's redaction of the complainant's statements to Jovanovic, and its consequent

limitation on the defense's cross-examination of the complainant regarding her interest and participation in sadomasochism and her relationship with Luke, resulted in a violation of defendant's Sixth Amendment right to confront the People's primary witness (*see, Olden v Kentucky*, 488 US 227, *supra*; *see also, State v Colbath*, 130 NH 316, 540 A2d 1212, 1217, *supra*).

Admittedly, the constitutional guarantee of the right to confront the prosecution's witnesses is not absolute, and may be circumscribed by statutory evidentiary restrictions (such as the Rape Shield Law) which serve " 'the legitimate demands of the adversarial system' " (*People v Williams*, 81 NY2d, *supra*, at 313, quoting *United States v Nobles*, 422 US 225, 241; *see also, Michigan v Lucas*, 500 US 145, 149). However, no legitimate evidentiary restrictions were applicable here.

While even a proper application of the Rape Shield Law may interfere to an extent with the defendant's right to confront witnesses, it must be remembered that, generally, the evidence precluded by such laws, of other, unrelated sexual conduct by the complainant, is of little or no probative value. "To the extent that shield statutes limit the accused from unfairly attacking the morality of a rape victim, they are unobjectionable" (Tanford and Bocchino, *Rape Victim Shield Laws and the Sixth Amendment*, 128 U Pa L Rev 544, 589 [1980]). Where the precluded evidence is highly relevant, however, the deprivation of fundamental constitutional rights cannot be justified merely by the protection of the complainant from an attack on her chastity.

### The Prejudice to the Defense

The court's erroneous preclusion of the e-mail messages and other relevant, admissible evidence from the jury's consideration was particularly egregious, in view of the People's approach in presenting the case against Jovanovic. He was depicted as a monstrous sadist, scanning the Internet for unwary victims, preying on unknowing, naive innocents. In contrast, while the People, and indeed, the complainant, both acknowledged that she had flirted with Jovanovic in her messages, trying to impress him with her wit and intelligence, the complainant was basically portrayed as naive, overly trusting, overly polite and ill-informed.

The excluded e-mail stating that the complainant and Luke had a master-slave relationship that included the infliction of pain, and the e-mail in which the complainant referred to the "pain fiends at the Vault" and to herself as a " 'pushy bottom,' "

i.e., a masochist who pushes the dominant partner to inflict more pain than intended, would have enabled Jovanovic to provide a counterpoint to the People's portrayal of the complainant and avoid the prejudice potentially created by the unbalanced portrayal. It would also have permitted Jovanovic to effectively place the complainant in a somewhat less innocent, and possibly more realistic, light. For instance, the complainant made certain remarks in her e-mails, such as "rough is good," and "dirt I find quite erotic," for which she provided the jury with completely innocent explanations. Defendant was unable to plausibly offer alternative, more suggestive readings of such e-mail remarks, as long as the jury was unaware of the extent of the complainant's interest in sadomasochism.

Jovanovic should have been given the opportunity to inquire as to what the complainant meant by her remarks regarding her participation in sadomasochism. If, in fact, they were exaggerations, or flights of fancy, their extreme nature would be relevant to the issue of the complainant's veracity and reliability. If they were exact statements of fact, Jovanovic should have been permitted to bring to the jury's attention the possibility that the person the complainant had referred to as her "master" might have been unhappy about her experiencing sadomasochism with another "master." He should also have had the opportunity to explore the complainant's intention and purpose in disclosing to him that she was involved in such a relationship.

As the case stood, Jovanovic was precluded not only from bringing out the degree to which the complainant seemed to be inviting sadomasochism, but from exploring the possibility that the complainant was a less reliable narrator of events than she appeared to be at trial. For instance, the prosecutor was able to repeatedly ask the rhetorical question, "Why would she lie?" while the defense was unable to point to an evidentiary basis for any plausible reason, although more than one existed (e.g., her "master" might have been unhappy with her had she told him her conduct with Jovanovic was consensual; or, she made a practice of creating elaborate sexual fantasies). The prosecutor was also able to remark in summation, without any possible contradiction, that if the complainant had wanted to engage in sadomasochism, she could have said so in her e-mails.

Finally, the erroneous ruling in effect gutted Jovanovic's right to testify fully in his own defense, since it prohibited him

from offering the jury any evidence justifying an asserted belief that the complainant had indicated a desire to participate in sadomasochism with him.

In light of the degree to which the defense was hampered, both in demonstrating that the complainant had consented to participating in sadomasochism, and in challenging the complainant's reliability and credibility as a witness, the conviction must be reversed in its entirety. Upholding the conviction on the assault charges, as the dissent suggests, would ignore the prejudice resulting from Jovanovic's inability to adequately challenge the complainant's credibility and reliability. We are unable to conclude that the error was harmless.

## Other Evidentiary Errors:

### Limitation of Inquiry into Karen's Claim of Rape

At trial, the complainant testified to her part in bringing Karen to the hospital when Karen said she had been raped. The court also permitted Luke to offer his belief that Karen's claim was motivated by her desire to interfere with his relationship with the complainant. However, following a pretrial hearing at which Karen testified, Jovanovic was prevented from inquiring before the jury what the complainant knew about what had actually occurred to Karen. In particular, he was unable to inquire into her e-mail message that "said intrest [sic] plotted my death as well as a means of getting attention, thus the rape."

The court determined in its pretrial hearing that Karen had not actually made a false rape claim, but rather, had expressed uncertainty as to whether the event would fall within the definition of rape. The court therefore concluded that the complainant could not be said to have been a party to a false rape claim, and prohibited all inquiry into this e-mail message. This ruling, too, was an improper limitation of the defense.

As a result of the court's prevention of further inquiry, the jury was left with only the complainant's initial e-mail statement about Karen having been raped, including the complainant's assertion at trial that she doesn't "understand violence." Preventing Jovanovic from cross-examining the complainant regarding the meaning of the words "[Karen] plotted my death as well as a means of getting attention, thus the rape," meant he was unable to cross-examine the complainant regarding the puzzling interaction between Karen and the complainant: whether they treated each other as friends, rivals, or strang-

ers. The jury was left to arrive at the possible false conclusion that the complainant had acted as a good Samaritan and assisted an acquaintance who had been raped. While these points were not central to the elements of the charged crimes, by preventing Jovanovic from seeking to clarify the complainant's misinformation, he was unable to call into question the resultant image of the complainant as responsible, trustworthy, accurate and innocent.

### The Spectator Article

In addition, the trial court erred in permitting the People to place in evidence the full text of a news article from the Columbia University campus newspaper, the *Spectator*, reporting the story of a woman named Sharon Lopatka, who in October 1996 was killed by a man with whom she had initiated an on-line relationship.

The foundation for the prosecutor's use of the article was Jovanovic's reference, in one of his e-mails, to a *Spectator* article about Sharon Lopatka, in response to the complainant's request for suggested plots for a snuff film. On the basis of that reference, the trial court permitted the prosecutor to read into the record the full text of the article in the course of the complainant's direct examination, apparently on a theory that judicial notice could properly be taken of the article. Defense counsel was not permitted any voir dire on the issue of whether this article had been the subject of an on-line conversation between the complainant and Jovanovic, or indeed what the complainant knew of the story.

Had counsel been permitted a brief voir dire, the court would have found that, as the complainant testified immediately after the article was placed in evidence, in fact she had not understood Jovanovic's reference to have been to that particular article. Consequently, there was no proper foundation for its admission into evidence. Nor was the introduction of the complete article into evidence justified by the concept of "judicial notice," which applies to the introduction of indisputable facts and matters of common knowledge (*see*, Prince, Richardson on Evidence § 2-201 *et seq*. [Farrell 11th ed]).

Moreover, its prejudicial impact was not properly considered. The article told the story of Sharon Lopatka's on-line acquaintance with a Maryland man whom she had informed of her desire to be tortured and killed, and about her ultimate death, allegedly at the hands of this man. The introduction of the full text was unnecessary, and because of its potentially inflamma-

tory effect under the circumstances, its introduction was improper, and only served to compound the prejudicial impact of the other errors.

Accordingly, the judgment of the Supreme Court, New York County (William Wetzel, J.), rendered May 29, 1998, convicting defendant, after a jury trial, of kidnapping in the first degree, sexual abuse in the first degree (three counts), assault in the second degree and assault in the third degree, and sentencing him to a term of 15 years to life on the kidnapping conviction concurrent with lesser sentences on the remaining convictions, should be reversed, on the law, and the matter remanded for a new trial.

MAZZARELLI, J. P. (concurring in part and dissenting in part). While I agree with the majority's conclusion that a new trial is required because the trial court misapplied the Rape Shield Law when it precluded material evidence which may have affected the conviction on the kidnapping and sex abuse counts, a different perspective informs my analysis. Further, I would affirm the defendant's conviction on the assault charges.

I agree, for the reasons set forth in the majority opinion, that the introduction of the full text of the *Spectator* article was improper. I share the view that the erroneous admission of this evidence had an enormous prejudicial impact on the defense. With respect to the redacted e-mails, I would also find that the complainant's statements concerning her interest in sadomasochistic practices should have been admitted, because the Rape Shield Law (CPL 60.42), which is designed to preclude introduction of "[e]vidence of a victim's sexual conduct," is not meant to exclude statements of interest in sex (*see, People v Kellar*, 174 AD2d 848, 849, *lv denied* 78 NY2d 1128; *People v Hauver*, 129 AD2d 889, 890). Further, even were these statements to be covered by the statute, I would find that they should have been admitted under the interests of justice exception set forth in CPL 60.42 (5), because they are relevant to both the complainant's state of mind and defendant's perception of her thinking. The complainant's discussion of these topics in her electronic conversations with the defendant preceding their date was necessary to provide the jury with an accurate factual narrative.

However, I disagree with the majority that the complainant's conversations concerning sex with other individuals were improperly excluded under CPL 60.42, and I would also find that the third redacted November 20th e-mail was properly

redacted because it concerned a direct statement relating to the complainant's prior conduct, her sadomasochistic relationship with her boyfriend. This redaction was also appropriate because the transmission described behavior which would serve only to disparage the complaining witness's reputation.

The defense argues that the third redacted November 20th e-mail should have been admitted in its entirety pursuant to CPL 60.42 (4), to support a claim that the complaining witness's boyfriend could have been the source of her injuries. I disagree. The defense was not prevented from putting this theory before the jury as it was allowed to question the complaining witness's boyfriend himself as to whether he had inflicted any bruising upon the complainant in the days preceding the incident. This is the only bruising relevant to this case. The determination to limit inquiry to this issue was not an improvident exercise of discretion, and again comports with the purpose of the Rape Shield Law. This is especially true when viewed within the context of the main theory articulated by the defense, which is that the alleged violent acts did not take place. Based on this position, details of prior consensual, violent behavior were properly redacted from the e-mail as they would be irrelevant to the defense on the kidnapping and sexual abuse counts.

Unlike the majority, I would not find the third redacted November 20th e-mail admissible under CPL 60.42 (5), the interest of justice exception to the Rape Shield Law. Since CPL 60.42 (5) is designed to allow the introduction of material which has been deemed presumptively inadmissible, the proffered evidence merits careful scrutiny (*see*, Berger, *Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom*, 77 Colum L Rev 1, 34). Given the complainant's right to sexual self-determination, I would find that the inflammatory nature of the evidence of her prior sexual conduct would, in the eyes of the jury, outweigh the probative value of this evidence. Presenting this information could mislead the jury to conclude that the complainant was more likely to consent to the charged sexual offenses because she had previously consented to similar, violent acts (*see*, *People v Williams*, 81 NY2d 303 [precluding evidence that complainant had formerly engaged in group sex in a gang rape prosecution]).

Further, the majority states that, "the strength of the evidence as to the extent to which the complainant initially indicated to Jovanovic an interest in participating in sadomasochism with him *is* relevant to a determination of whether that

consent was withdrawn" (emphasis in original). I strongly disagree. The encounter should be evaluated on the basis that the complainant, as any person engaging in sexual activities, had a continuing legal right to withdraw her consent to any of the actions taking place in Jovanovic's apartment. The only evidence relevant to that issue is that which relates to the events in question.

The Rape Shield Law was expressly drafted for the purpose of protecting those persons who are sexually active outside a legally sanctioned relationship. It serves the very important policy objective of removing certain impediments to the reporting of sex crimes. Specifically, the law was drafted to encourage victims of sex offenses to prosecute their attackers without fear that their own prior sexual activities, regardless of their nature, could be used against them at trial. In enacting the Rape Shield Law, the Legislature sought to prevent muddling the trial with matters relating to a victim's prior sexual conduct which have no proper bearing on the defendant's guilt or innocence, but only serve to impugn the character of the complainant and to prejudice the jury. To limit its applicability and protections as the majority holds would only serve to turn the clock back to the days when the main defense to any such charge was to malign the complainant. Here, where a victim's sexual preferences are widely disapproved, it is crucial that evidentiary determinations be made with heightened concern that a jury may act on the very prejudices that the statute seeks to exclude.

Additionally, I would affirm the defendant's convictions for second- and third-degree assault. Penal Law § 120.05 (2) provides that a person is guilty of second-degree assault when, "[w]ith intent to cause physical injury to another person, he causes such injury to such person * * * by means of a deadly weapon or a dangerous instrument," in this case by scalding the complaining witness with hot wax. Further, Penal Law § 120.00 (1) provides that a person is guilty of third-degree assault when "[w]ith intent to cause physical injury to another person, he causes such injury to such person," here by biting the complaining witness. As the majority correctly notes, neither statutory section provides for a consent defense, nor do these sections list lack of consent as an element to be proven by the prosecution (cf., Penal Law § 120.05 [5] ["without * * * consent" is an element of the offense]; Penal Law § 130.05 [consent established as a defense to various degrees of sexual abuse crimes]). While several New York cases, decided over 25

years ago, have indicated that consent, if intelligently given, can be a defense to a charge of assault (*People v Steinberg*, 190 Misc 413, 416-417 [assault charge sustained where nurse purported to vaccinate people against smallpox but injected only water]; *see also*, *People v Freer*, 86 Misc 2d 280 [third-degree assault charge sustained in altercation between football players which took place after players got up from a pile-up]; *People v Lenti*, 44 Misc 2d 118 [indictment for third-degree assault after fraternity hazing was sustained since the students did not consent to physical harm]), this rule has not been crystalized in this State. Moreover, a number of cases from other jurisdictions have held that the consent defense is not available to an assault charge in the context of sadomasochistic activities (*see generally*, *People v Samuels*, 250 Cal App 2d 501, 58 Cal Rptr 439, *cert denied* 390 US 1024 [defendant charged with assault arising from sadomasochistic activities could not rely on consent defense]; *Commonwealth v Appleby*, 380 Mass 296, 402 NE2d 1051 [same]; *State v Collier*, 372 NW2d 303 [Iowa] [same]). Given the facts of this case, I would find that the court's instruction that consent was not a valid defense to the assault charge was not error.

Further, despite the evidentiary errors which require a new trial on the kidnapping and sexual abuse counts, I would find the complaining witness's testimony was sufficient to support both of these convictions (*People v Arroyo*, 54 NY2d 567, *cert denied* 456 US 979), and, in the circumstances, hot candle wax was appropriately considered a dangerous instrument (Penal Law § 10.00 [13]). Moreover, the complainant's testimony was corroborated by a neighbor who heard sounds as if someone were "undergoing root canal" from defendant's apartment at the time in question, by the complaining witness's prompt outcries to five individuals, some of these individuals' observations of the complaining witness's injuries, the lab results as to her clothing, and the e-mails sent between the complaining witness and defendant subsequent to the incident. I find no basis to disturb the jury's determination to credit this testimony (*People v Prochilo*, 41 NY2d 759).

In addition to dissenting from portions of the majority opinion, I am compelled to write separately to emphasize the fundamental importance of the Rape Shield Law, which is designed to assure that a defendant is not allowed to evade responsibility for his criminal acts by impugning the reputation of a complainant.

Motion seeking leave to file an *amicus curiae* brief denied.

RUBIN and ANDRIAS, JJ., concur with SAXE, J.; MAZZARELLI, J. P., concurs in part and dissents in part in a separate opinion.

Judgment, Supreme Court, New York County, rendered May 29, 1998, reversed, on the law, and the matter remanded for a new trial. Motion seeking leave to file an *amicus curiae* brief denied.