Hinkle, J.
This case arises out of various disputes among‘shareholders of a closely-held corporation. In May and July of 1999, the parties were before the court for a juiy waived trial on the breach of contract claim of plaintiff Ali Malihi (“plaintiff’) and the counterclaims of defendant Dariush Gholizadeh (“defendant”). In his complaint, plaintiff alleges that defendant failed to repay loans of $40,910, ofwhich$37,510was secured *660 by two promissory notes. Defendant counterclaims for fraud, breach of contract, breach of fiduciary duty and unjust enrichment.
On the basis of the credible evidence and the reasonable inferences I draw therefrom, I find and rule as follows under Mass.R.Civ.P. 52(a).

FINDINGS OF FACT

.Worldwide Broadcasting Network (“WBN”) is a closely held Delaware corporation founded by plaintiff, defendant and Dr. Ali Kazeroonian (“Kazeroonian”)[2] in January 1996 to provide video content over the Internet. The original idea, conceived by defendant, was that WBN would take material typically shown on television and make it available over the Internet through hundreds of thousands of customized video channels.
Defendant and Kazeroonian, who had been colleagues in a previous business venture, began planning WBN during 1995. Both had backgrounds in technology. Defendant had studied computer science at Boston University, and Kazeroonian had a Ph.D. in physics from the Massachusetts Institute of Technology. Shortly after they started looking for individuals to bring financing and marketing expertise to WBN, defendant was introduced to plaintiff. Plaintiff had previously worked for 14 years at Paine Webber, reaching the level of Senior Vice President with over $100 million in assets under management and an annual income of approximately $500,000.
Plaintiff told defendant and Kazeroonian that he left Paine Webber in November 1995 because he considered WBN a great business opportunity as a start-up. The defendant and Kazeroonian relied on plaintiffs financial success at Paine Webber in deciding to include him in their venture. Defendant did no due diligence at Paine Webber with regard to plaintiffs employment. Had he done so, he would have learned that plaintiffs departure from Paine Webber was involuntary and acrimonious.
When WBN was formed, Kazeroonian was the principal developer and designer of the company’s technology. He served as the president of WBN until May 1997. WBN employed defendant as its chief executive officer until late 1998. Plaintiffs principal responsibility at WBN was to secure equity financing to fund the development of WBN’s products. Because defendant and Kazeroonian had no financial expertise, they relied on plaintiff to handle the financial aspects of WBN’s development.
At various times before September 1996, plaintiff advanced money for the initial capitalization of WBN, including payment for the initial shares of WBN stock issued to defendant and Kazeroonian. On May 11, 1996, plaintiff gave defendant a check for $10,000. In September 1996, defendant executed a promissory note in the amount of $10,000 payable to plaintiff. On October 22, 1996, plaintiff gave defendant a check for $3400 for defendant’s personal expenses. Although defendant was to repay this money under the same terms as the promissory note, no note was ever executed.
In addition, in September 1996, defendant and Kazeroonian each executed a promissory note payable to plaintiff dated March 31, 1996 in the amount of $27,510. Neither defendant nor Kazeroonian actually received this money; the notes reflected plaintiffs payment to WBN for stock in WBN. The promissory notes were largely drafted by plaintiff, who insisted that defendant and Kazeroonian execute personal notesfor repayment of plaintiffs capital contributions to WBN on behalf of defendant and Kazeroonian.
In January 1996, defendant and Kazeroonian reasonably expected that plaintiff, based on his own statements, would secure $5 million in equity financing for WBN by June 1996. By March 1996, plaintiff had lowered his initial projection to $2 million and extended his performance date to October 30, 1996, and defendant knew about plaintiffs reduced expectations.
Each promissory note executed by defendant contained a schedule of payments, including an initial maturity date of September 1, 1997. The payment schedule set forth that payments would be made in 12 equal payments and that the “entire principal amount shall be repaid on September 1, 1997.” When the promissory notes were executed, plaintiff was aware that defendant and Kazeroonian’s shares of stock in WBN and their salaries were their only means of repayment for the notes. Defendant and Kazeroonian insisted that the promissory notes contain a provision tying the timing of their repayment obligation to their ability to pay, based on their salaries at WBN.
Consequently, the payment schedule (but not the fact of repayment) was conditional on plaintiff s securing at least $2 million in equity financing for WBN on or before October 30, 1996. If WBN failed to obtain the required financing, the promissory notes provided that the payment schedule “shall be adjusted as the [parties] shall mutually agree, in writing.” The requirement that WBN secure $2 million in equity financing before the notes became due and payable reflected the fact that defendant and Kazeroonian could repay the promissory notes only if plaintiff raised sufficient capital for WBN to maintain and increase their salaries. WBN did not secure equity financing of at least $2 million on or before October 30, 1996. As of October 9, 1996, plaintiff had secured only $800,000 in equity financing for WBN.
WBN achieved the projected goal of $2 million in equity financing early in 1997. However, plaintiff himself did not meet his projections for raising equity financing, either in amount or timing. During plaintiffs tenure, WBN raised only slightly more than $2 million in equity financing.
*661 In 1997, after WBN had secured equity financing of $2 million, plaintiff asked defendant to modify or adjust the payment schedule. Defendant never agreed upon a modified payment schedule and has never repaid any of the funds referenced in the promissory notes or otherwise loaned him by plaintiff. Neither plaintiff nor defendant ever negotiated with the other in good faith to modify or adjust the payment schedule.
In December 1996, defendant told plaintiff that his performance in raising equity financing was inadequate, and that, as a result, his future at WBN was uncertain. Soon after, in February 1997, plaintiff made his first demand for repayment of the promissory notes.
For a variety of reasons, including plaintiffs inability to raise the money he had projected, WBN became strapped for the funds necessary to pay operating expenses and continue its business. By March 1997, WBN faced bankruptcy if it did not obtain immediate financing to meet payroll and other operating expenses. Thus, at that time, plaintiff loaned WBN $50,000 on a short term basis to meet operating expenses. Subsequently, defendant brought in an investor, Prince Khalid (“Khalid”), who was willing to bail WBN out of its financial crisis. From the funds Khalid invested in WBN in March 1997, WBN repaid the $50,000 plaintiff had loaned the company earlier that month.
Khalid conditioned each of his investments in WBN upon delivery by the officers of WBN, as shareholders, of a specified number of their common shares. The officers — including plaintiff, defendant and Kazeroonian — agreed to tender shares to Khalid in exchange for his emergency capital contributions, and they communicated this agreement to each other and to Khalid. These agreements required plaintiff, in or around March 1997, to tender 90,000 of his shares to Khalid in exchange for Khalid making an additional capital contribution to WBN. At that time, plaintiff, defendant and Kazeroonian were fellow officers, shareholders and directors of WBN, and, as such, had fiduciary obligations to WBN and to each other.
On March 24, 1997, after his $50,000 loan to WBN had been repaid, plaintiff set forth in writing and signed his agreement to transfer 90,000 of his shares to Khalid in exchange for Khalid’s continued investment in WBN. Plaintiff delivered the March 24, 1997 agreement to defendant as Chief Executive Officer of WBN. The letter agreement, as written, is unconditional, and makes no reference to the promissory notes.
Defendant and the other officers of WBN, as shareholders, reasonably relied on the plaintiffs agreement to transfer 90,000 of his shares to Khalid. Immediately before plaintiffs execution of the March 24, 1997 agreement, defendant informed plaintiff that there would be no link between the plaintiffs obligation to transfer shares and the defendant’s obligation to repay the promissory note.
Defendant forwarded plaintiffs March 24, 1997 agreement to Khalid, who thereafter wired funds to WBN. Plaintiff did not, however, transfer any shares to Khalid on or after March 24, 1997. When plaintiff had not transferred his shares by April 14, 1997, defendant transferred an additional 90,000 of his own shares to Khalid to preserve Khalid’s investment in the company.
On April 14, 1997, plaintiff was suspended as a director of WBN, and on May 20, 1997 he was terminated as an employee and discharged as a director. At or around the same time, plaintiff sent formal demand, default and acceleration letters to defendant and Kazeroonian seeking a default rate of interest and immediate payment in full on the promissory notes. At that time, defendant and Kazeroonian lacked the financial ability to repay the notes in their entirety, the notes were not in default, and the parties had not negotiated a modified and adjusted repayment schedule.
On or about June 5, 1997, plaintiff filed this action against defendant and Kazeroonian, claiming that the promissory notes were in default and seeking payment in full plus interest and attorneys fees. Plaintiff filed his suit three months before the promissory notes’ initial maturity date of September 1, 1997. On June 18, 1998, Kazeroonian and plaintiff agreed to settle all claims between them, including those in this litigation, for a one time payment by Kazeroonian to plaintiff of $30,000.
During the summer of 1998, defendant transferred his entire remaining shareholding interest in WBN to Khalid and, at some point thereafter, Khalid became' Chairman of the Board of Directors of WBN. Defendant currently owns no shares of stock in WBN.

CONCLUSIONS OF LAW

I. Plaintiff’s Breach of Contract Claim
Defendant argues that, under the language of the promissory notes, he is not obligated to repay the monies loaned him by plaintiff because 1) plaintiff failed to secure the required funding and 2) the parties were unable to renegotiate a mutually acceptable repayment schedule. Defendant contends that unless he agrees to renegotiate the repayment schedule, he has no obligation to repay the money loaned him by plaintiff. That interpretation is not consistent with the express language of the promissory notes.
If the wording of a contract is unambiguous, the contract must be enforced according to its terms. See Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). Both promissory notes executed by defendant were subject to the condition that if WBN failed to obtain financing of at least $2,000,000 by October 30, 1996, the schedule of payments, but not the un *662 derlying debt itself, would be modified and adjusted by the mutual written agreement of the parties.
This provision clearly reflected the parties’ understanding that the timing of defendant’s repayment, but not the fact of repayment, depended on his receiving a salary from WBN. See Computer Systems of America, Inc. v. Western Reserve Life Assur. Co. of Ohio, 19 Mass.App.Ct. 430, 475 (written contracts should be fairly and reasonably construed to ascertain the intent of the parties and to achieve their purpose). The promissory notes suggest, although not with any degree of precision, that the repayment period and terms are to be renegotiated if WBN failed to raise $2 million by October 30, 1996. Thus, the express language of the notes enabled defendant to restructure the repayment schedule, but specifically did not excuse him from his obligation to pay the underlying debt.
It is undisputed that WBN failed to obtain $2 million in financing by October 30, 1996, but had secured that amount by early 1997. It is also undisputed that defendant never agreed to a revised payment schedule. Consequently, I find and rule that defendant is liable to plaintiff for payment of the full $40,910 ($37,510 secured by the two promissory notes, and the plaintiffs personal loan for $3400), as well as the interest provided in the notes.
As noted, under the terms of the notes, the parties are required to negotiate a new payment schedule.[3] Because that has not occurred, although defendant is liable for payment of the notes and the $3400, he is not technically in default, because the parties failed to work out the new payment schedule.
Therefore, judgment will enter for plaintiff on the complaint in the amount of $40,910 plus interest. Defendant and plaintiff shall, within 30 days from the date of judgment, mutually agree in writing on a repayment schedule. If the parties fail to reach an agreement, the court will hold a hearing on whether to issue a mandatory payment schedule and the defendant will be required to submit an affidavit setting forth to plaintiff and this court his current debts and liabilities.
II. Defendant’s Counterclaims

A. Fraud

Defendant argues that he should not be bound by the promissory notes because plaintiff fraudulently misrepresented that his departure from Paine Webber was voluntary and because defendant relied to his detriment on that misrepresentation. To establish a prima facie case of misrepresentation, a party must show a false statement of a material fact made to induce the other party to act, together with reliance on the false statement by the other party to that party’s detriment. See Zimmerman v. Kent, 31 Mass.App.Ct. 72, 78 (1991).
The credible evidence does not support defendant’s claim of fraud. To prevail upon a fraud or misrepresentation claim, the person making the claim must prove that the other party made a false representation or “uttered a half truth which may be tantamount to a falsehood.” See Kannavos v. Annino, 356 Mass. 42, 47 (1969) (seller who advertised property for multifamily use obligated to disclose that zoning regulations prevented use of property as multi-family dwelling). Where an individual chooses to provide information to another, therefore, he is obligated to do so honestly and to divulge all material facts within his knowledge. Id. Defendant contends that plaintiffs statement that he left Paine Webber because WBN offered a great start-up opportunity constituted a half truth because he failed to disclose Paine Webber had terminated him.
Defendant must also show, however, that the alleged misrepresentation by plaintiff was material to his signing the promissory notes, taking the loans from plaintiff or joining with him in founding WBN. The standard here is whether “a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question.” Zimmerman at 78, quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir.1966). The plaintiff may have been less than totally forthcoming about the details of his departure from Paine Webber. But there is no evidence he was ever specifically asked whether he left Paine Webber voluntarily.
Here, defendant and Kazeroonian brought plaintiff into WBN because of his obvious financial and marketing expertise. There is no credible evidence that plaintiffs involuntary departure from Paine Webber related in any way to his undisputed fund-raising abilities.
Accordingly, the counterclaim for fraud will be dismissed.
B. Breach of Contract
On March 24, 1997, plaintiff wrote defendant confirming a prior oral agreement that plaintiff would transfer 90,000 shares of his stock in WBN to Prince Khalid in return for Khalid’s continued investment in the company.[4] As noted, plaintiff never transferred these shares, although Khalid invested the promised funds in WBN.
Defendant argues that plaintiffs failure to transfer these shares to Khalid breached a contract with defendant as a third-party beneficiary of the agreement to transfer shares in exchange for the investment of funds. It is indisputable, however, that WBN, not defendant or Kazeroonian, was the third-party beneficiary of the arrangement to provide Khalid with shares in WBN in return for his financial investment.
Because defendant has no individual standing as a third-party beneficiary, this contract claim can be brought only as a derivative action on behalf of the corporation. See Bessette v. Bessette, 385 Mass. 806, 810 (1982). Thus, since it was not brought derivatively, defendant’s counterclaim for breach of contract fails.
*663 C. Breach of Fiduciary Duty
Defendant argues that, by violating his promise to transfer 90,000 of his shares in WBN to Khalid, plaintiff breached his fiduciary duty to the defendant. On the credible evidence, I find and rule that this claim has merit.

1.Validity of the Agreement

Plaintiff first contends that his March 24, 1997 letter to defendant confirming his intent to transfer funds to Khalid is not binding because there is no consideration for that promise. A contract must of course be supported by consideration to be valid and legally enforceable as a contract. See Old Colony Trust Co. v. Commissioner of Corporations and Taxation, 346 Mass. 667, 671 (1964). Here, however, I find that sufficient consideration exists. Plaintiffs letter states: “I trust our . . . agreements will bring good times and days of success into WBN.” At that moment in time, because WBN was in desperate financial condition, the consideration for plaintiff s transfer of stock was the continued viability of WBN through Khalid’s investment.
Plaintiff also contends that Khalid agreed to pay defendant’s debts to plaintiff in exchange for the 90,000 shares and failed to do so, and that, therefore, he was not obligated to transfer the 90,000 shares to Khalid. Although plaintiff attempts to substantiate this claim with a subsequent e-mail communication written by him, his March 24, 1997 agreement contains no such provision, and there is no credible evidence Khalid or WBN made any such agreement.

2.Standing

Plaintiff argues that, even if the March 24, 1997 letter constitutes a valid agreement, defendant lacks standing to sue for breach of fiduciary duty on this issue because plaintiff s only fiduciary duty was to the corporation, not the individual shareholders.
Generally, where the fiduciary duty claimed by a plaintiff is a duty owed to the corporation, the plaintiff may not assert a claim as an individual, but only derivatively on behalf of the corporation. See Bessette v. Bessette, 385 Mass. 806, 810 (1982). In Bessette, when minority shareholders attempted to recover excess salary that had been paid to a majority stockholder, the Supreme Judicial Court held that the right to recover those overpayments belonged to the corporation. Id. at 809.
However, in Massachusetts a shareholder in a closely held corporation may have a direct fiduciary duty to other shareholders in the corporation. See Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 597 (1975). See also Bodio v. Ellis, 401 Mass. 1, 9 (1987) (shareholders in a close corporation owe each other duties of the utmost loyalty, trust, and confidence).
Here, the individual shareholders each agreed to transfer stock to Khalid in order to try to keep WBN solvent. Because plaintiff failed to make the promised transfer of his shares, defendant transferred an additional 90,000 of his own shares in order to preserve Khalid’s investment. Therefore, this situation is distinguishable from Bessette. Here, the principal shareholders of WBN made a mutual agreement to transfer their individually owned common stock to Khalid in exchange for cash to keep the company solvent. Thereafter, they had a fiduciary duty to each other to honor that agreement. When plaintiff failed to transfer his shares as promised, he breached his fiduciary duty to defendant.
The remedy for this breach is to put the innocent party “as nearly as possible in the same position which he would have occupied if there had been no wrongdoing . . .” See Zimmerman v. Bogoff, 402 Mass. 650, 660 (1988), quoting Shulkin v. Shulkin, 301 Mass. 184, 192-93 (1938). Therefore, defendant is entitled to the fair market value of the 90,000 shares he transferred to Khalid after plaintiff failed to do so. The value of the shares is to be determined as of the date of the plaintiffs breach, namely on or around March 1997. If the parties cannot agree on this value within 30 days, they may apply to the court for a hearing on the issue.
D. Unjust Enrichment
Finally, defendant contends that plaintiff was unjustly enriched by his breach of his fiduciary duly. On the credible evidence, I find and rule that defendant was unjustly enriched by retaining the shares he had agreed to transfer to Khalid. Where a fiduciary profits from breaching his duty of loyalty, “a court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and prevent his unjust enrichment.” See Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 556 (1997).

ORDER OF JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby ORDERED:
1. Judgment shall enter for plaintiff on the complaint, in the amount of $40,910 plus interest as set forth in the promissory notes.
2. Judgment shall enter for defendant on the counterclaims of breach of fiduciary duty and unjust enrichment.
3. Judgment shall enter for the plaintiff on the counterclaims of fraud and breach of contract.

 Kazeroonian was originally named as a defendant but settled with plaintiff.

 The parties vigorously dispute whether either side made a legitimate effort to renegotiate the terms of the notes.

 Plaintiffs letter provided that he would transfer 50,000 shares personally and 40,000 shares from a Trust in which he held an interest.